**FLEMING, Administrator of Wage and Hour Division, United States Department of Labor, v. ALTERMAN et al.**

No. 2250.

District Court, N. D. Georgia, Atlanta Division.

April 2, 1941.

Gerard D. Reilly, Sol., Irving J. Levy, Asst. Sol., in charge of litigation, Wage and Hour Division, Abner Brodie, Bessie Margolin, and Erwin B. Ellmann, all of Washington, D. C., and Geo. A. Downing, Regional Atty., of Atlanta, Ga., for plaintiff.

Edgar Watkins & Allan Watkins, of Atlanta, Ga., as Amici Curiae.

Geo. & John L. Westmoreland, of Atlanta, Ga., for defendants.

RUSSELL, District Judge.

This is a suit brought by the Administrator of the Wage and Hour Division of the United States Department of Labor, hereinafter called the Administrator, seeking an injunction to restrain the defendants, Alterman Brothers, a partnership, hereinafter called Alterman, from violating Sections 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, U. S.C.A., Title 29, § 201 et seq.

Alterman, a partnership of three brothers, conducts a wholesale grocery business in Atlanta, Georgia, handling a general

line of staple groceries, including canned fruits, paper products, sugar, cereals, flour, soaps, candy, gum and tobaccos. The line of goods handled by it includes hundreds of popular brands which are manufactured by hundreds of concerns located in all parts of the United States. More than ninety (90%) per cent of these products (stated in defendants' answers to the interrogatories propounded by plaintiff under Rule 33, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, to be ninety-nine and one-half (99½%) per cent) are manufactured and originate outside the State of Georgia, such as canned goods, canned fruit juices and vegetables, milk paper products, soaps, teas, tobaccos, chewing gum, packaged flours, coffee, sugar, and candy, from several canners and processors in Indiana, Wisconsin, Tennessee, Florida, Illinois, California, Missouri, New York, Pennsylvania, New Jersey, North Carolina, Alabama, and Louisiana.

Among these products are two brands of canned foods packed for Alterman in Indiana and there labelled with the label "Packed for Alterman Brothers," put in cases and periodically trucked by the packing company from Indiana to Alterman's warehouse in Georgia. Alterman also has the exclusive right to distribute in the Atlanta area certain canned fruits under a designated label packed by a company in California, and has a similar exclusive agency for the distribution of designated labelled peas, packed in Wisconsin.

Shipments from out of the State arrive daily at Alterman's warehouse by means of all the common agencies of interstate transportation. Some goods are shipped by rail direct to the spur track and unloading dock at the back door of Alterman's place of business. Transports of interstate truck lines and out-of-State manufacturers' trucks arrive daily at the unloading platform with goods manufactured in numerous other States. Other consignments are picked up by Alterman's trucks from pool cars, freight stations, or the warehouses of brokers or manufacturers' agents in Atlanta.

Alterman's receiving clerk estimates that approximately thirty-five (35%) per cent of their merchandise comes to their warehouse by the carrier truck lines and the manufacturers' trucks, thirty (30%) per cent comes by freight cars switched on to Alterman's spur track by the interstate railroads and approximately thirty-five (35%) per cent is picked up by defendants' own trucks from pool cars, freight stations or warehouses of brokers and manufacturers' agents. Defendants are billed by and remit to the out-of-State sellers for all shipments originating out-of-State, though orders are usually taken in Atlanta.

In 1938 Alterman's gross sales amounted to $794,963.86, and in 1939 they amounted to $871,492.60. About sixteen (16) workers, including warehousemen, truck drivers, office workers and salesmen, are employed. Defendants' place of business is a three-story building, and the second floor by reason of topographical conditions is at ground level, and at this place all goods are unloaded from trucks and cars. All delivery trucks of Alterman are loaded at the front of the building by means of a chute from the second floor, by which the outgoing merchandise is sent down.

All goods as unloaded are immediately moved into the warehouse in the packages or containers in which they arrive, and placed in separate assigned stock piles for each type or brand of goods, and all but a very small portion of the goods move through the warehouse and are delivered to Alterman's customers in the same package, bag or carton in which they are received. Sales from a "broken stock room" are very small, and in general it is exceptional for a merchant to order less than a full case or carton.

Alterman's sales are made by salesmen, who go regularly from place to place on fixed routes taking orders for future delivery, and which are delivered by trucks along regular fixed routes. Alterman has been in the wholesale grocery business in Atlanta for about seventeen (17) years, and the great majority of its customers have been purchasing from defendants regularly for many years, seventy-five (75%) per cent of the present customers being on defendants' books as customers two years ago. These customers are visited by salesmen each week and deliveries are made at least once weekly on a regular schedule and delivery truck routes.

Witnesses who do the purchasing for Alterman testified that experience has shown them about how many orders will come in each week in the usual course of trade, so that the amount of such orders can be anticipated. The stock of goods in the warehouse corresponds substantially to the amounts necessary to fill recur-

ring orders received in the usual course of trade, and the records of sales indicate that Alterman's customers generally purchase the same items in much the same quantities at regular recurring intervals.

Alterman's business requires rapid turnover and profit is made only when the goods move out to the retailer. The longer any particular item remains in stock, the lesser profit may be anticipated from its sale. It is essential that there be a minimum of delay in the movement of the goods to the retailer. The actual speed with which commodities move through the warehouse varies with the particular type of goods, or brand, and with various circumstances.

If a stock pile of particular items is low or exhausted, such item may be unloaded from the incoming truck or freight car and immediately placed on an outgoing truck to fill an order already obtained. Numerous items are "turned over" within a week or ten days, so that within that time all of the product in stock has been moved out and new stock received by shipment to maintain the average stock pile. Thus an item with a two-weeks turnover period will be completely renewed and shipped out twenty-six (26) times in one year. Some items have a slower turnover, but the average rate of turnover for all products is about ten (10) times per year.

Some times an item of stock is purchased several months in advance, but most items remain in the warehouse no longer than necessary to match up orders which are coming in from continually recurring sources along well-defined and certain routes. It is not necessary for defendants to keep a larger stock on hand, for most items handled can be secured within a week or ten days from the out-of-State manufacturers, and many items can be shipped over night, if ordered by telegraph or long-distance telephone.

In the conduct of the business, orders frequently come in for goods the stock of which is exhausted, and defendants must make the purchases from out of the State to fill such orders, and in such instances they are placed on trucks for delivery almost immediately upon arrival.

Defendants distribute their goods in a well-defined territory and along certain routes, the radius being about fifty (50) to seventy (70) miles, in which they have approximately five hundred (500) customers who are retail grocers in Georgia who place continually recurring orders for the same products, ordering either by brand name or by description or from samples. They also do business with hotels and restaurants, and various State and Federal institutions, and much of this type of business is secured through bids for long-term contracts specifying the size and kind of products to be furnished. These products are packed in larger than ordinary sized containers, and must be purchased to fill these contracts.

Occasional drop shipments are made to customers, that is, shipments made direct from the manufacturer to the customer who has given his order to Alterman, and who pays Alterman for the goods. Other wholesale grocers competing with Alterman have territory of practically the same size, and as a consequence wholesalers both within and without the State operate in the same territory, though the competition is not always between the same merchants. Such trading areas are not restricted by State lines, but are influenced by highways, freight zones, distances, and other factors affecting distribution costs.

Wholesalers competing directly with Alterman also receive the bulk of their goods from outside of the State in which they are located and some, generally depending upon location, ship goods into other States. Retailers in Georgia near the State line are served by wholesalers in adjoining States, and some Georgia wholesalers serve customers in adjacent States. Defendants compete with out-of-State wholesalers and with Georgia wholesalers who sell out-of-State.

Wholesale grocers compete primarily on a price basis, and labor costs constitute a large portion, some thirty (30%) to fifty (50%) per cent, of total operating expenses, and a wholesaler paying lower wages than his competitor, or reducing his labor costs by longer hours of work, translates his saving in labor costs into lower prices. Thus a wholesaler selling only within the State can cause out-of-State wholesalers to lose customers, and thus divert the normal flow of interstate commerce.

The evidence in behalf of the Administrator, not contradicted, discloses that a wholesale business, such as carried on by Alterman, is that of a middleman situated at an intermediary point in a flow of goods in commerce from manufacturers to retailers. The Alterman business is that of

distribution; after the getting together of grocery products from all parts of the United States, it assembles them and transports them to the hundreds of retail and distribution outlets, thus forming the connecting link between the interstate shipper and the retail stores for consumers. Products move continuously through the wholesaler without any change and for the most part without being unpacked.

Evidence was also presented tending to show that a strike in Alterman's business over wages and hours would immediately result in the blocking of the movement of goods into and from the defendants' warehouse, so that all shipments from out of the State to Alterman would have to cease, and evidence as to the importance of standards of minimum wages and maximum hours in the field of industrial disputes, and that the most frequent immediate cause of strikes has revolved around working hours and wages, and the effect upon commerce as a whole which results from strikes, was detailed.

Upon the trial by the Court without a jury, the evidence clearly disclosed violations of the wage, hour, overtime payment, and record keeping provisions of the Act, and as to this the defendants make no contention preferring to place their case solely upon the question of whether the defendants, Alterman, are engaged in commerce within the meaning of the Act, which is denied. The above statements are adopted as the Court's findings of facts.

At the trial and in the briefs it was asserted that if it should be determined that Alterman was covered by the Act it had every intention of complying fully with all its terms and provisions and therefore an injunction would not be necessary. It was further asserted in the brief that the sole question for determination by the Court is, Does Alterman's business come within the terms of the Act, and is it and its employees covered thereby? The case will therefore be considered and decided on the issue as thus restricted.

The argument of defendants is based upon the proposition that since the defendants do not ship goods out of the State, and confine their activities solely within the State of Georgia, that they are not engaged in interstate commerce. In support of this position counsel relies on the Schechter case, Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and the following argument that after the purchase of the goods and their "coming to rest" in Alterman's warehouse, any further distribution was purely local and did not meet the test, stated to be well-settled, of subsequent shipment across State lines.

A judge seeking to determine in a close case whether the business or transaction involved is in commerce, and after searching the authorities throwing light upon this question, will find himself in thorough accord with the words of Mr. Justice Field that: "commerce is a term of the largest import" (Welton v. Missouri, 91 U.S. 275, 280, 23 L.Ed. 347), and will discover many decisions whose diverse facts and rulings give abundant support to the statement of Chief Justice Marshall, in defining commerce among the several States, that it is a "general term, applicable to many objects." Gibbons v. Ogden, 9 Wheat. 1, 188, 6 L.Ed. 23.

No precedent has been submitted or discovered controlling the precise situation here presented, and consequently the question must be determined in the light of principles ruled in other cases so far as applicable to the facts of this case. It should be stated at the outset that in the present case, heard and submitted before the decision of the Supreme Court in United States v. Darby Lumber Company, 61 S.Ct. 451, 85 L.Ed. ——, no point is raised as to the constitutionality of the Fair Labor Standards Act of 1938. Nevertheless, decisions upon the constitutionality of State enactments and interference with commerce throw light upon what is commerce and whether Alterman's business is commerce, and help to determine whether it and its employees are engaged in commerce. By commerce is of course meant commerce among the several States, or as usually designated, interstate commerce, commerce in its constitutional sense, for it is not contended that the provisions of the Act are applicable to local commerce.

A study of the authorities discloses that in determining what does and does not constitute commerce the circumstances, continuance and extent of the transaction in question have been and may be considered, and that no court has ever attempted to lay down a definite and unvarying formula by which the problem may be solved.

Considering the facts in the present case, undoubtedly the sales, shipment and trans-

portation by those who sell to Alterman are interstate commerce, and it likewise can not be questioned that the goods purchased by Alterman are in commerce at least until they are unloaded. By such purchases, Alterman brings into play the operations of manufacturers and packers in a large number of other States of the Union. Thereby the wheels of interstate transportation by rail and truck are brought into motion, not in isolated transactions, not as an occasional instance, but day by day and week by week throughout the years. The seller and shipper is engaged in commerce, the railroad and truck lines transporting the purchases are engaged in commerce, the employees who unload the shipments are engaged in commerce, so that at least until the time that the merchandise is finally delivered to Alterman all substantial elements and all component parts of the sale, shipment, transportation and delivery indelibly stamp the transactions as interstate commerce.

But it is urged that because the goods so introduced never thereafter leave the State of Georgia the stamp of interstate commerce is thereby erased, so that all subsequent handling and dealing therein is local or internal commerce. The argument overlooks the effect of the evidence that at least a portion of such goods never really stop in the warehouse, and those which are stored do not "come to rest" but as a rule have only a short "breathing spell" until they continue to what has been in effect, and in the minds of all the parties from the beginning, their ultimate destination, the retailer or consumer. This contention also overlooks the fact that due to this, continuous and recurring, purchase — sale — transportation — unloading — delivery — resale — repurchase — and so on round and round the circle during the year, the defendant at least wades in the stream of commerce if indeed he does not swim therein.

The antecedent interstate parentage of the goods purchased and stored by Alterman may be considered established. Does the fact that such goods are not thereafter shipped beyond the limits of the State render the business of selling them local commerce under the facts shown by the evidence?

No definite standard of determining the question of whether goods lose their interstate character after shipment and re-sale has been enunciated by any case I have discovered. Courts rather prefer to judge each case by its facts. The exigencies of trade determine what is essential to the business or process of interstate commerce in that trade. Thames & Mersey Marine Insurance Company, Limited v. United States, 237 U.S. 19, 35 S.Ct. 496, 59 L.Ed. 821, Ann.Cas.1915D, 1087. For instance, in declaring a statute of Missouri which taxed goods that were the product of manufacturers of other States and exempted those of Missouri the Court observed that it "would be premature to state any rule which would be universal in its application to determine when the commercial power of the Federal Government over a commodity has ceased, and the power of the State has commenced. It is sufficient to hold now that the commercial power continues until the commodity has ceased to be the subject of discriminating legislation by reason of its foreign character." Welton v. Missouri, supra.

This and similar rulings such as Cook v. Pennsylvania, 97 U.S. 566, 573, 24 L.Ed. 1015, Tiernan v. Rinker, 102 U.S. 123, 125, 26 L.Ed. 103, and Leisy v. Hardin, 135 U.S. 100, 125, 10 S.Ct. 681, 34 L.Ed. 128, demonstrate that Federal control of commerce extends across State lines and in the instances specified until the goods are sold. These and similar cases dealing with State discrimination are not strictly in point, but are illustrative. Also illustrative of goods shipped interstate continuing their interstate character, even after receipt by the consignee, are cases under the Food and Drug Statute, 21 U.S.C.A. § 1 et seq., holding that articles transported from one State to another may be condemned even in the hands of the consignee, even where there was no intention of sale but merely that they would be used in the bakery business. This use is stated to be only "one step from a sale." Further, that such articles can be confiscated after they have reached their destination and are in the hands of the consignee in the original packages, upon the ground that this was necessary in order to effectuate the intention of Congress within the broad scope of the commerce clause of the Constitution, art. 1, § 8, cl. 3. Hipolite Egg Company v. United States, 220 U.S. 45, 31 S. Ct. 364, 55 L.Ed. 364.

As illustrative of the continuance of the interstate commerce character of articles, it is held that in case of adulterated articles they may be condemned under the Food and Drug Act "while being transported or

when they have reached their destinations, provided they remain unloaded, unsold, or in original unbroken packages," and that "the protection accorded to this [interstate] commerce by the Federal Constitution extended to the sale by the receiver of the goods in the original packages. Leisy v. Hardin, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128, 3 Interst.Com.R. 36; [In] re Rahrer, 140 U.S. 545, 559, 560, 11 S.Ct. 865, 35 L.Ed. 572, 575, 576; Plumley v. Massachusetts, 155 U.S. 461, 473, 15 S.Ct. 154, 39 L.Ed. 223, 227, 5 Interst.Com.R. 590; Vance v. W. A. Vandercook Co., 170 U.S. 438, 444, 445, 18 S.Ct. 674, 42 L.Ed. 1100, 1103, 1104; Schollenberger v. Pennsylvania, 171 U.S. 1, 22–25, 18 S.Ct. 757, 43 L.Ed. 49, 57, 58; Heymann v. Southern R. Co., 203 U.S. 270, 276, 27 S.Ct. 104, 51 L.Ed. 178, 180, 7 Ann.Cas. 1130." Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 720, 724, 56 L.Ed. 1182. See also, Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 290, 42 S.Ct. 106, 66 L.Ed. 239.

Considering the business of Alterman in the light of its practical effects, under the evidence, in view of the continuing and recurring interstate purchases for distribution, the fact that Alterman purchased for itself rather than distributed as agent would not affect the character of its subsequent deliveries and sales, and would render applicable the principles ruled in the decisions above quoted. Without regard to the questions of State discrimination, taxation, or other legal effects which the fact of purchase might give rise to, the practical result is the same and the sale and delivery of such merchandise is in truth an essential requirement and component part of the continuance of the initial commerce originated between the Georgia purchasers and the out-of-State manufacturers and sellers.

It is clear that as a practical matter, when orders are taken from the retailers and consumers Alterman intends that they be filled primarily from the broad reservoirs of commerce, even though they may flow through or temporarily stop in the warehouse. The latter is in effect no more than a storage tank installed for temporary and immediate use, but with thought and reliance constantly fixed upon the source of supply and central reservoir, the out-of-State manufacturers and processors.

In Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 47 S.Ct. 255, 258, 71 L.Ed. 534, the question stated by the Court was: "Whether the sale by the wholesaler to the retailer in the same state is a part of interstate commerce where, subsequently at the instance of the seller and to perform his part of the contract, the paper is shipped from a mill in another state to or for the retailer." In answering this question the Court held:

"And what is or is not interstate commerce is to be determined upon a broad consideration of the substance of the whole transaction. Dozier v. Alabama, 218 U.S. 124, 128, 30 S.Ct. 649, 54 L.Ed. 965, 28 L.R.A. (N.S.) 264. Such commerce is not confined to transportation, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. And it includes the buying and selling of commodities for shipment from one state to another. Dahnke-Walker Co. v. Bondurant, 257 U.S. 282, 290, 42 S.Ct. 106, 66 L.Ed. 239; Lemke v. Farmers Grain Co., 258 U.S. 50, 55, 42 S.Ct. 244, 66 L.Ed. 458. The absence of contractual relation between the manufacturer and retailer does not matter. The sale by the wholesaler to the retailer is the initial step in the business completed by the interstate transportation and delivery of the paper. Presumably the seller has then determined whether his source of supply is a mill within or one without the state. If the contract of sale provided for shipment to the purchaser from a mill outside the state, then undoubtedly it would be an essential part of commerce among the states. Sonneborn Bros. v. Cureton, 262 U.S. 506, 515, 43 S.Ct. 643, 67 L.Ed. 1095. Clearly the absence of such a provision does not affect the substance of the matter when in fact such a shipment was contemplated and made. Cf. Dozier v. Alabama, supra; Western Union Tel. Co. v. Foster, 247 U.S. 105, 113, 38 S.Ct. 438, 62 L.Ed. 1006, 1 A.L.R. 1278; Lemke v. Farmers Grain Co., supra [258 U.S. at page] 55. (42 S.Ct. 244 [66 L.Ed. 458]). The election of the seller to have the shipment made from a mill outside the state makes the transaction one in commerce among the states. And on these facts the sale by jobber to retailer is a part of that commerce."

In the present case no real question is ever presented that the actual source from which the goods ordered by the customers would be supplied is in the State of Georgia. It is well known by defendants and their customers that the merchandise

they order week in and week out must come from out-of-State. Under the facts of this case, when it is well known from long practice that the usual course of the business involves shipments from outside the State to fill the order, and when in fact such shipments were contemplated and made, the absence of an express prior contract becomes inconsequential. "Clearly the absence of such a provision [express contract] does not affect the substance of the matter." Federal Trade Commission v. Pacific States Paper Trade Association, supra, 273 U.S. at page 64, 47 S.Ct. at page 258, 71 L.Ed. 534.

In Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 309, 44 S.Ct. 96, 99, 68 L.Ed. 308, the general rule is stated to be "that where transportation has acquired an interstate character 'it continues at least until the load reaches the point where the parties originally intended that the movement should finally end.' Illinois Central R. R. Co. v. Louisiana R. R. Comm., 236 U.S. 157, 163, 35 S.Ct. 275, 276 (59 L.Ed. 517), and see, Western Union Tel. Co. v. Foster, 247 U.S. 105, 113, 38 S.Ct. 438, 62 L.Ed. 1006, 1 A.L.R. 1278; Western Oil Refining Co. v. Lipscomb, 244 U.S. 346, 349, 37 S. Ct. 623, 61 L.Ed. 1181."

■ Viewing the business of Alterman as a whole in an effort to determine whether it is engaged in commerce, and applying the statement of Mr. Justice Holmes in Swift & Co. v. United States, 196 U.S. 375, 395, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518, that such commerce "is not a technical legal conception, but a practical one, drawn from the course of business," the fact that instead of being an agent of the out-of-State sellers it is a purchaser would be immaterial and would render the reasoning of the Binderup case applicable here. The purpose of The Fair Labor Standards Act is the protection of commerce without regard to the ownership of goods moving in it. As to the practical aspects of such transactions as are here in proof, and the legal consequences resulting therefrom as it relates to the question of commerce, see Grand Union T. Co. v. Evans, D.C., 216 F. 791; Wholesale Grocers' Association v. Federal Trade Commission, 5 Cir., 277 F. 657; Eastern States Retail Lumber Dealers Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Federal Trade Commission v. Wallace, 8 Cir., 75 F.2d 733; and Southern Hardware Jobbers' Association v. Federal Trade Commission, 5 Cir., 290 F. 773.

In Currin v. Wallace, 306 U.S. 1, 59 S. Ct. 379, 83 L.Ed. 441, it is held that the inspection and grading of tobacco, even though taking place before the auction and sale, has immediate relation to the sales in interstate and foreign commerce. In Mulford v. Smith, 307 U.S. 38, 47, 59 S. Ct. 648, 83 L.Ed. 1092, it is held that the sale of tobacco for interstate shipment may be controlled as an exercise of the regulation of commerce. In Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954, the canning of fruits and vegetables raised in one State, but sold later interstate, is held to be in commerce. United States v. Darby Lumber Company, supra, affirms the proposition that manufacture, even if only with intent to ship in commerce, is within the terms of The Fair Labor Standards Act.

If the initiatory otherwise local sale or manufacture is commerce because related to the conclusion of broad and general interstate commerce, no valid reason appears why the converse is not true, that is, where the initiatory transactions of purchase, transportation and sale arise out of and are a part of broad general interstate commerce, the conclusion of such transactions, while having local aspects, is any less commerce when such conclusion is intended to and always does result from the initiatory transaction.

■ In other words, whether the apparently local transaction takes place at the beginning or at the end of interstate commerce would not seem to be material. This view finds support in the decision of National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 671, 83 L.Ed. 1014. While in that case the shipments were made into the State and subsequently outside the State, it is stated that the shipments were "not any the less interstate commerce because the transportation did not begin or end with the transfer of title of the merchandise transported."

In Mulford v. Smith, supra [307 U.S. 38, 59 S.Ct. 652, 83 L.Ed. 1092], the regulation of local sales of tobacco is stated to be "a regulation of interstate commerce, which it reaches and affects at the throat where tobacco enters the stream of commerce,— the marketing warehouse." In the present case there are many throats for entrance into the stream of commerce, all outside

the State. The streams converge by interstate flow in the business and warehouse of Alterman and can only be cleaned and evacuated by a continuing flow on to the outlets for which they were there brought, in this case the retail purchasers. It may be also stated that without the continuing flow there would be no business for Alterman and to this extent no outside throats.

Interstate commerce must have a beginning and an ending. It makes no difference whether the beginning is little and the ending big, or the beginning big and the ending little. In such a case the commerce is the same throughout and the figures are congruous. Under the circumstances, Alterman and his business is not any the less engaged in commerce because it does not further carry on the stream of commerce into another State. The proposition that antecedent acts may engage one in commerce as well as subsequent acts would appear to be supported by authority and is certainly sound in reason.

It is true that before the tremendous increase and progress in transportation and communication between States, with all the means of present access and transactions between the several States, shipment across State lines was considered essential to constitute interstate business. While the definition remains unchanged, commerce, intercourse among the States, is increased and enlarged with each additional degree and development of transportation and communication, and the application becomes correspondingly broadened. Even the "ether" is employed in interstate commerce (Fisher's Blend Station v. Tax Comm., 297 U.S. 650, 56 S.Ct. 608, 80 L. Ed. 956; City of Atlanta v. Southern Broadcasting Co., 184 Ga. 9, 190 S.E. 594), and the future will doubtless present even more novel conditions requiring application of the commerce power.

If the contention that wholesale grocers may remove themselves from engaging in interstate commerce by confining their sales and shipments to one State be correct, it must follow that the consequent establishment of forty-eight (48) separate trading areas, by States, and confined to State boundaries, could result without concern or interference by the national government, and this despite the great dislocation of present commerce which would result. Such is contrary to the fundamentals underlying the adoption and employment of the commerce clause for the protection and promotion of uninterrupted national commercial intercourse.

The question can not be determined on the basis of preference or abhorrence of centralization of Federal authority. Power to regulate commerce has existed from the adoption of the Constitution. Fundamentally, it is the immense broadening of the scope of commerce rather than centralization by Federal regulation which has called forth (and doubtless will continue to require), ever-widening application of the long existent power. Thought will bring to mind many instances of interstate commerce, now overlooked, which escape our attention until their consequences become so nationally material that Congress deems some regulation necessary, or some situation arises which brings the true nature of particular transactions into focus. As illustrative, radio receiving sets, so common in cottage and mansion, have been designated as "essential instrumentalities" of interstate commerce. Station WBT v. Poulnot, D.C., 46 F.2d 671, 675.

He who ships interstate is unquestionably engaged in commerce, and one whose business is to all practical purposes exclusively the receipt and distribution of such shipments by wholesale and in such manner as to produce a constant and continuous recurrence thereof is also so definitely enmeshed as a part thereof by the day in and day out receipt and distribution of such goods as he who ships them. Each activity is a part of the whole of commerce between the several States, and the whole includes the parts.

The question of whether there is subsequent interstate shipment furnishes one test of interstate commerce, but does not supply a definite and unvarying standard which may be applied to all transactions to measure and define their inter or intrastate character. Of necessity, each transaction and business must be determined in the light of all surrounding circumstances. Where, as in the present instance, a wholesale grocery business employs all of the instrumentalities of commerce to produce a recurring and constant flow of goods in commerce, and its profit and prosperity depends solely on the rate and amount of such flow, and an essential part of its business is unloading and delivering (frequently without any storage)

interstate shipments; a business which has goods packed under its name in other States for Georgia distribution and is sole distributor in its territory for California and Indiana packers; which contracts for in advance and thereafter orders from out-of-State supplies and therefrom furnishes goods to carry out the contract, extending over a period of time; which by experience knows in advance approximately what goods will be required to supply its trade, and thus keeps only one-tenth (1/10) of the goods sold yearly on hand at any one time; which directly competes with out-of-State wholesalers, and a stoppage of which would burden and dislocate interstate commerce, as well as other circumstances in proof, such business is engaged in interstate commerce within the terms and intent of the Fair Labor Standards Act of 1938.

It may be interesting to note that the same conclusion as to wholesale grocers generally was reached by the general counsel of the United States Wholesale Grocers Association, peculiarly well acquainted with the method of conducting such business, as shown by a bulletin of such Association attached as Appendix II to plaintiff's brief.

As stated above, no question of whether all employees of the defendant are engaged in commerce, or whether from the nature of their duties some are exempted from the terms of the Act, is presented. The case was tried on the broad ground of whether the defendant was engaged in commerce. However, it is apparent from the evidence that substantially, if not all, of Alterman's employees are so engaged. Neither is it contended that the required wages or compensation for overtime were paid, nor that correct records were kept as required by Section 11(c) of the Act.

The plaintiff, having shown that Alterman is engaged in commerce within the terms of the Act, and continuous violation of the wage, hour, and overtime provisions of the Act, and failure to keep correct records, is entitled to the injunction sought, and the plead promises of future compliance will not justify refusal of his prayer. If future compliance is intended to be made, judicial forbidding of non-compliance can not harm the defendants.

The conclusion of law is that the defendants in the wholesale grocery business are engaged in commerce within the Fair Labor Standards Act of 1938; that they have continuously violated the provisions of Sections 15(a) (2) and 15(a) (5); and that an injunction should issue restraining further violation thereof.

After the above conclusion had been reached by the Court, but before filing, counsel for defendants has called attention to the case of Jewel Tea Co. v. Williams, et al., 10 Cir., 118 F.2d 202, decided March 6, 1941. In view of the different facts and questions presented in the two cases the ruling that the transactions there considered did not constitute interstate commerce does not lead in the present case to a conclusion contrary to the one above announced.

Proper decree may be presented after notice, providing for the issuance of the injunction as prayed.