## BROWN (ELLIOTT, Intervener) v. MINNGAS CO.
### Civil Action No. 83.

District Court, D. Minnesota, Second Division.

June 29, 1943.

Thomas R. Webb, of New York City, and Earl Hacking and Daniel S. Feidt, both of Minneapolis, Minn., for plaintiff.

A. R. English, of Tracy, Minn., and Hall, Catlin & Gold, of Marshall, Minn., for defendant.

JOYCE, District Judge.

This action was brought pursuant to the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq. (hereinafter called the Act), by Rollo E. Brown for himself and as agent for Virgil Brown and Leland Douglas. Anna Mae Elliott has intervened. All seek to recover back wages and liquidated damages as provided for in Section 16(b) of the Act.

The defendant Minngas Company is a Minnesota corporation doing business in and around Tracy, Minnesota. It sells propane gas and appliances which operate with gas. It also services such appliances. All the propane gas and most of the appliances which it sells are received from sources outside of Minnesota. Before April 5, 1939, all of the defendant's sales were intrastate, but since that time it has sold and delivered both gas and appliances at wholesale to dealers outside of Minnesota in addition to retaining its Minnesota business.

The plaintiffs Rollo E. Brown and Leland Douglas and Virgil Brown serviced appliances, transferred the propane from the railroad tank cars into defendant's tanks and gas mains, filled and maintained gas cylinders which defendant sold to customers, delivered appliances, and did similar work which the litigants do not state in detail. Plaintiff Anna Mae Elliott was employed as an office worker. She did bookkeeping, stenographic, and general office work.

In contesting this action defendant claims that:

(1) Only Anna Mae Elliott was employed by defendant.

(2) Defendant was not engaged in interstate commerce or in the production of goods for commerce during the period material herein.

(3) Plaintiff was not engaged in commerce or in the production of goods for commerce during the time material herein.

(4) Application of the maxim, De minimis non curat lex, prevents plaintiffs from recovering.

(5) Defendant's business is a local retailing or servicing business and plaintiffs were employed in local retailing capacities as required by Section 13(a) (1) and 13(a)

(2) of the Act. Therefore the Act is inapplicable.

(6) Plaintiffs are within the provisions of the Motor Carrier Act of 1935 and therefore the exemption set out in Section 13(b) (1) of the Act prevents the application of the Act to the instant case.

I. Were Plaintiffs Employed by Defendant?

Since defendant admits that Anna Mae Elliott was their employee, this issue affects only the Browns and Douglas. The issue turns on whether Earl K. Ostgaard was an independent contractor. Ostgaard was a foreman of defendant company and orally contracted with defendant on December 31, 1939, to thereafter supply the labor for defendant's work.

■ The question is resolved by the state law, for, as pointed out in Maddox v. Jones, D.C.Ala., 1941, 42 F.Supp. 35, 41, the Fair Labor Standards Act did not intend to change any relationships which existed prior to its enactment. The court said: "* * * the definitions in the Act were not intended by Congress, however moved it was by humanitarian impulses, to destroy the well founded and long established rules fixing the status and affecting the relationship of employer and employee in actions based upon that relationship." Therefore, if the state law—the law which existed and determined the relationship between the parties prior to the enactment of the Fair Labor Standards Act—made Ostgaard either an independent contractor, or an employee of defendant, that result would still prevail.

■ This conclusion reasonably follows from the fact that, as held in Bowman v. Pace Co., 5 Cir., 119 F.2d 858, the purpose of the Fair Labor Standards Act was to apply the new law to existing relationships and not to impose upon one person a wage liability to another to whom the first person had not previously been liable for wages. Likewise, to create different tests for an employer-employee relationship under the Act would risk confusion in other fields of law. The only reason for a different rule would be to include or to exclude more workers from the Act.

■ The Minnesota Supreme Court holds that one who controls or has the right to control a worker is his employer. Wass v. Bracker Const. Co., 185 Minn. 70, 240 N.W. 464; Larson v. Duluth Woolen Co., 181 Minn. 417, 232 N.W. 915. The Restatement of Agency, Section 2, points out that the skill required for a particular job; whether the work is part of the regular business of the employer; whose tools are used; and what the parties believe is the relationship between them, are factors also to be considered in determining whether a given individual is an independent contractor.

■ In view of these factors I am of the view that defendant was the plaintiffs' employer. When Leland Douglas quit his job, Henley, defendant's general manager and president, told him that he could return to his job if the new one did not prove satisfactory. Likewise, when Virgil Brown asked Ostgaard if he could return to work for defendant company, Ostgaard informed him that he must see Mr. Henley first. Neither Ostgaard nor any representative of defendant informed plaintiffs that Ostgaard would be their employer after December 31, 1939. On the contrary, Henley continued to give plaintiffs orders with respect to their work after that date. These orders consisted, among other things, of written job orders which usually were quite detailed. According to plaintiffs' testimony Henley also gave them oral instructions. Certainly, it seems obvious that these job orders were not his only instructions to plaintiffs with respect to their work. On March 5, 1940, Mr. Henley issued a "Bulletin to All Employees" and on June 11, 1940, he issued a "Notice to all Employees". These directives pertained to work which plaintiffs performed. Indicating in the March Bulletin that he was the one to whom those performing the work were responsible, Mr. Henley concluded, "I will not accept any excuses from anyone in not obtaining this information." Both directives were initialed by plaintiffs. Since they were not initialed by the other employees and pertained to plaintiffs' work, they were evidently directed primarily to plaintiffs and by their very titles show what relationship defendant considered itself to be in with plaintiffs. Significantly, the June notice was also initialed by "E. K. O." presumably Earl K. Ostgaard.

There is no claim that Ostgaard furnished labor for any other company. The tools, trucks, and equipment used by plaintiffs were owned by defendant company and not by Ostgaard. Plaintiffs were paid directly from defendant company funds. In fact, for a period after January 1, 1940, they were paid by defendant's checks which Henley signed. When plaintiffs asked Ost-

gaard about a raise, he informed them that he must see Mr. Henley about it first.

■ Therefore, it would appear th[a]t defendant company controlled the hiring of the labor which Ostgaard contracted to supply, determined the wages which they were paid, supplied them with the equipment necessary to do the work of defendant, and gave them orders with respect to that work. It is clear in view of these facts and the authority above noted that Ostgaard was not the independent contractor alleged. The fact that Ostgaard's wages were to be determined by the cost of labor and defendant's sales does not require a different conclusion when viewed in the light of the other evidence. Likewise, the fact that Ostgaard requested and obtained a Social Security number as plaintiffs' employer does not change the result. Although such an act might have probative value, it is not conclusive evidence. If the transfer of a social security account without an employee's knowledge could make the transferee an employer, irresponsibles could become employers in a technical but not actual sense, to the detriment of the employee and the general public. The uses for such a rule as a dodge to justifiable liability are manifest.

Therefore, in view of all of the evidence, I am of the opinion that all of the plaintiffs were employees of the defendant company.

## II. Are Plaintiffs Covered by the Act?

■ Defendant contends that plaintiffs cannot recover if *defendant* was not engaged in commerce or in the production of goods for commerce. A determination of that argument is unnecessary here, for it is elementary that plaintiffs cannot recover if *plaintiffs* are not engaged in commerce or in the production of goods for commerce. Fair Labor Standards Act, Sections 6 and 7, 52 Stat. 1062, 1063, 29 U.S.C.A. §§ 206, 207. Section 6 of the Act by providing the minimum wages which shall be paid by every employer "to each of his employees who is engaged in commerce or in the production of goods for commerce", and Section 7 by providing the maximum hours such employees shall be employed, look to the nature of the employee's work and not to the nature of the employer's. Fleming v. Jacksonville Paper Co., 5 Cir., 1942, 128 F.2d 395; Fleming v. A. B. Kirschbaum Co., 3 Cir., 1941, 124 F.2d 567 at page 570. See also Fleming v. American Stores, D.C. Pa., 1941, 42 F.Supp. 511. Therefore, the real question is whether the jobs performed by plaintiffs caused them to be engaged in commerce or in the production of goods for commerce within the meaning of the act.

■ (a) Unloading goods from an interstate carrier: Persons engaged in unloading interstate carriers are engaged in commerce within the meaning of the Act. Walling v. Mutual Wholesale Food & Supply Co., D.C.Minn., 1942, 46 F.Supp. 939. See also Klotz v. Ippolito, D.C.Tex., 1941, 40 F.Supp. 422; Super-Cold Southwest Co. v. McBride, 5 Cir., 1941, 124 F.2d 90; Fleming v. Alterman, D.C., 38 F.Supp. 94; Jax Beer Co. v. Redfern, 4 Cir., 1941, 124 F.2d 172.

■ Plaintiffs Rollo E. Brown, Virgil Brown and Leland Douglas pumped the gas into defendant's tanks from the railroad tank cars which brought the gas from other states. Under the above decisions while engaged in that work they were engaged in commerce within the meaning of the Act.

(b) Assembling, treating, and filling the gas cylinders:

Section 3 (j) of the Act provides: " * * * for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

■ Plaintiffs handled, filled, and treated the gas cylinders which defendant sold to customers both in and out of Minnesota. Likewise, it seems that this work was necessary to the production of the commodity for the cylinders could not be sold unless they were filled with the gas which plaintiffs put into them, and kept in proper condition. Consequently, plaintiffs Rollo E. Brown, Virgil Brown and Leland Douglas, who did this work, were producing goods for commerce when they were engaged in filling, handling and treating the gas cylinders which defendant sold to its customers. Although neither the defendant nor plaintiffs knew which cylinders would be sold to dealers outside of Minnesota, both must have reasonably expected that some of them would be shipped outside of Minnesota during the normal course of business, for defendant was selling them to out of state dealers after April 5, 1939. Such an expectation is sufficient to justify a finding

that plaintiffs were producing goods for interstate commerce within the meaning of the Act. United States v. Darby, 1941, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. See also Sec. 5 of Interpretative Bulletin No. 1, issued September 22, 1938.

(c) Repairing, servicing, and delivering appliances in other states and delivering gas across state lines:

 Defendant apparently does not claim that this work is not engaging in interstate commerce. In any event it does not specifically argue the issue. That the performance of such work does cause the worker to be engaged in interstate commerce is manifest. To conclude differently would be to ignore the very thing to which the Act applies—interstate commerce.

 (d) Office work: Anna Mae Elliott, the intervenor, is the only plaintiff who performed office work. There is no doubt that office workers are within the purview of the Act. Walling v. Mutual Wholesale Food & Supply Co., D.C.Minn. 1942, 46 F.Supp. 939. The intervenor did the bookkeeping, stenographic, and general office work with respect to the interstate business of defendant, thus coming under the protection of the Act. Fleming v. Jacksonville Paper Co., supra; Fleming v. American Stores, supra, 42 F.Supp. at page 525; Eddings, etc., v. Southern Dairies, D.C.S.C., 1942, 42 F.Supp. 664; See also Dahnke-Walker Milling Co. v. Bondurant, 1921, 257 U.S. 282, 290, 42 S.Ct. 106, 66 L. Ed. 239; Federal Trade Commission v. Pacific States Paper Trade Ass'n, 1927, 273 U.S. 52 at page 64, 47 S.Ct. 255, 71 L. Ed. 534.

### III. Does the Maxim, De Minimus Non Curat Lex, Apply?

Defendant contends that the maxim applies here. It will be noted, however, that the Supreme Court in United States v. Darby, 312 U.S. 100, at page 123, 61 S.Ct. 451, at page 461, 85 L.Ed. 609, 132 A.L.R. 1430, said: "Congress * * * has made no distinction as to the volume or amount of shipments in the commerce or of production for commerce by any particular shipper or producer. It recognized that in present day industry, competition by a small part may affect the whole and that the total effect of the competition of many small producers may be great. * * * The legislation aimed at a whole embraces all its parts. Cf. National Labor Relations Board v. Fainblatt, supra, 306 U.S. [601 at page] 606 [307 U.S. 609] 59 S.Ct. [668 at page] 671, 83 L.Ed. 1014."

 Such a statement seems to decide adversely defendant's contention that the volume of interstate commerce which it handled was not substantial enough to cause the Act to operate and that the time plaintiffs engaged in commerce or produced goods for commerce was so short in duration that it was not affected by the Act. The competition effected by many small producers who work each employee a short time in interstate commerce during each week can probably be just as great in volume as the competition effected by many small producers who ship a small amount of goods in interstate commerce each week, and who the court in the Darby case said were included in the Act. The purpose of the Act is to prevent competition by goods which are produced under substandard wage and hours conditions. Fair Labor Standards Act, 52 Stat. 1060, Sec. 2, 29 U.S.C.A. § 202.

 The Supreme Court in the Fainblatt case, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014, held that the de minimis doctrine applied under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., to situations in which the volume of goods affecting interstate commerce was not large. The Fair Labor Standards Act, however, does not have as broad an application as the Labor Relations Act. The latter act applies to businesses which merely "affect" commerce. If the de minimis doctrine were not applied, the Act's application would be unlimited. The Fair Labor Standards Act applies only to those employers whose employees actually are engaged in commerce or in the production of goods for commerce. Walling v. Mutual Wholesale Co., supra. By distinguishing the Fainblatt case in the Darby case, the Supreme Court has shown that it does not consider the situations the same. On the contrary, the purpose of the Fair Labor Standards Act, as noted, seems to preclude the application of the de minimis doctrine to the limited scope of the Act. Any limit set would be artificial and arbitrary. In the instant case the plaintiffs worked in commerce within the meaning of the Act only fifteen minutes some weeks. Other weeks they worked thirty minutes; others forty-five minutes; others one hour; and so on until some weeks they worked over

twenty hours in commerce within the meaning of the Act. In several weeks Virgil Brown worked over 45 hours in commerce. There is no logical point where it can be said that a sufficient difference exists between the hours spent one week and the number of hours spent another week so as to justify a holding that one week the plaintiff was not within the Act and another week he was.

Further, defendant's interstate sales have ranged from 6% to 55% of its total sales, and at no time do they appear to have been so insignificant that they could be said categorically not to be substantial in amount. And so far as the evidence shows the interstate work which each plaintiff performed was the same type which they were hired to perform. It was not work which was different from that which their usual duties required and which was performed only because of the moment's necessities.

 In view of these facts, therefore, it does not seem that the de minimis doctrine can be applied justifiably in this case and that it can be the basis for denying plaintiffs relief. Certainly it could not be used to deny plaintiffs relief for the weeks in which they worked 20, or 30, or 45 out of about fifty hours in commerce within the meaning of the Act. Because of the humanitarian nature of the Act any exemptions must be strictly construed.

IV. Are Plaintiffs or Defendant Exempted from Operation of the Act?

Defendant contends that the exemptions created by Section 13(a) (1), 13(a) (2) and 13(b) (1) prevent plaintiffs from recovering. The pertinent parts of Section 13(a) provide "The provisions of sections 6 and 7 shall not apply with respect to (1) any employee employed in a * * * local retailing capacity * * * (as such terms are defined and delimited by regulations of the Administrator); or (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

Plaintiffs contend that defendant cannot raise the defense of Section 13(a) (1) because it is an unpleaded affirmative defense. Although defendant pleaded Section 13(a) (2) specially, it clearly did not plead Section 13(a) (1) specially. The defense has been held to be an affirmative one by the Michigan Circuit Court in Cooper v. Gas Corp. (1941), 4 Wage and Hour Rept. 550.

Plaintiffs' work pertained both to retail and wholesale. The Administrator, acting pursuant to the authority granted by Section 13(a), has defined "employee employed in a * * * local retailing capacity" as follows: "* * * any employee (a) who customarily and regularly is engaged in (1) making *retail* sales the *greater part* of which are in intrastate commerce; or (2) performing work *immediately* incidental thereto, such as the wrapping or delivery of packages, and (b) whose hours of work of the same nature as that performed by nonexempt employees do not exceed twenty per cent of the number of hours worked in the workweek by such nonexempt employee." (Italics mine.)

 Defendant neither by evidence nor in its briefs has sought to demonstrate how many hours were spent by plaintiffs at wholesale as distinguished from retail work. Because defendant's wholesale sales may not have amounted to as much as its retail sales creates no necessary inferences for each week in controversy. Defendant does not appear to have sustained its burden of proof with respect to this question. The evidence does not indicate that plaintiffs *sold* the appliances or the gas. They merely delivered the gas and equipment and serviced the appliances. Defendant argues that servicing, connecting, and delivering the appliances and delivering the gas was a part of the retail sale. But part of plaintiffs' work consisted of servicing without charge appliances which had been delivered and connected previously and which were not working satisfactorily at the time of the servicing. Such work does not seem to be "immediately incidental" to the sale, as the Administrator's regulations noted above require. Such acts are unnecessary for the passing of either title or possession to the appliances.

Likewise, the regulations require that the employee be "customarily and regularly" engaged in making retail sales. As previously noted, plaintiffs were employed at other tasks in addition to those in defendant's retail business. They were also employed in wholesale work. Although the evidence shows the time which the men plaintiffs spent in interstate wholesale work, it does not segregate the time which they spent on intrastate wholesale and retail work. Consequently, no conclusion can be drawn as to the amount of time which plaintiffs spent in retail work, and in view of the fact that all the interstate sales were

wholesale sales, it seems clear that the men plaintiffs would not have been engaged in a retail capacity during all of their employment. The interstate work constituted a substantial part of their work, at least during certain periods.

I also doubt that defendant can succeed with its claim that it was a retail or service establishment and therefore not within the Act. Defendant sold gas and gas appliances at both retail and wholesale. The Administrator has declared that if more than 25% of the establishment's gross receipts are derived from non-retail sales, it will be considered a non-retail establishment. Interpretative Bulletin No. 6, issued December, 1938, revised June, 1941. Defendant's evidence indicates that its non-retail sales have exceeded this per cent every month since July, 1940. Therefore, defendant clearly cannot be a retail store at any time since that date. Defendant contends that the dollar volume should not be the basis for determining whether the company is a retail establishment. However, the sales are the backbone of the business, and it seems reasonable to classify a business according to the nature of its sustaining force.

It is doubtful also if defendant can be classified as a retail establishment prior to July, 1940. The Administrator has declared that only those establishments can be retail establishments within the meaning of Section 13(a) (2) which are considered retail establishments by the common acceptance of that term. As a practical matter this seems reasonable. In this case the defendant sold gas and appliances at a profit. It connected the appliances as part of the sale price, and the purchaser did not resell them, so far as it is material here, prior to July, 1940. It did this, however in connection with a distribution of gas to the public. The defendant held a franchise from the City of Tracy, Minnesota, to supply the residents with gas. This franchise regulates the rates to be charged, requires the company to furnish service to all who seek it, regulates the operation of the company, and permits gas mains to be laid in the street. The defendant did install gas mains in the streets and has furnished the people with gas through these mains. These services or functions characterize defendant as a company in the nature of a utility company. The Administrator has declared that utility companies are not retail or service establishments within the

meaning of the Act. I am of the view, therefore, that defendant cannot be considered a retail establishment within the meaning of the Act. Defendant's sales of gas always have exceeded its sales of appliances and defendant's counsel stated that the service business of defendant was offered so that the gas appliances would work better and encourage the use of more gas. The very name of defendant company— Minngas Company—indicates that the sale of gas is its principal business. In view of these premises, therefore, and the rule that exemptions to the Act should be strictly construed, Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, I am of the opinion that defendant has not proved itself within the exemptions set forth in Section 13(a) (2).

Defendant also contends that the exemption stated in Section 13(b) (1) prevents plaintiffs from recovering. This section provides: "The provisions of Section 7 shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of Section 204 of the Motor Carrier Act of 1935."

Section 204(a) of the Motor Carrier Act of 1935, 49 U.S.C.A. § 304, provides: "It shall be the duty of the Commission— * * * (3) To establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment. * * *"

Defendant's counsel states no reasons in his brief why plaintiffs are within this exemption. Plaintiffs' counsel points out, however, that defendant apparently is relying upon 18 U.S.C.A. §§ 383 and 385 to bring plaintiffs within the power of the Interstate Commerce Commission. These sections pertain to explosives and other dangerous articles, and they apply only to common carriers and those shipping by common carrier. Defendant has shown no facts which would justify a conclusion that it is also a common carrier when it is delivering propane gas or that it delivers the gas by common carrier. The statutes are directed only toward the transit of the dangerous articles and the Georgia Courts have indicated that they do not apply after the common carrier has de-

livered the article to the consignee on a sidetrack. Davis v. Gossett & Sons 30 Ga.App. 576, 118 S.E. 773, affirmed 158 Ga. 886, 124 S.E. 529. Plaintiffs therefore apparently are not within the exemption of Section 13(b) (1) whether they are delivering the propane gas or working with it at a tank car on the defendant's side-trackage.

### Conclusion.

Upon all of the foregoing grounds I conclude that plaintiffs are within the protection of the Fair Labor Standards Act and are entitled to recover against the defendant.

 It is settled in this district that employees may be protected by the Act one week but not the next. Walling v. Mutual Wholesale Co., supra. They can recover for the weeks in which they engaged in interstate commerce, or produced goods in commerce. Therefore, plaintiffs Rollo E. Brown, Virgil Brown and Leland Douglas can recover for each week in which they performed any of the interstate work previously noted. The parties agree that Anna Mae Elliott worked on defendant's interstate work every week during which she was employed by defendant. Thus, she would be entitled to the benefits of the Act for all the time which she worked for defendant. In computing the number of hours per week which plaintiffs worked, it is desirable to consider defendant's records as accurate since defendant apparently is the only one who kept consistent records. However, so far as the evidence indicates, no record of Anna Mae Elliott's time was kept. Defendant does not contradict her claim that she spent 60 hours a week at work. Her contention, therefore, must be accepted as accurate.

The following formula may be used as a guide in determining the amounts due plaintiffs:

(1) $\dfrac{\text{Week's wages}}{\text{Hours of work}}$ equals hourly rate of pay,

(2) Hour rate of pay x 44 hours (maximum hours from week of Oct. 28, 1938 to Oct. 28, 1939) equals amount due for regular time.

(3) Hourly pay (answer to (1) x 1½ equals overtime rate of pay.

(4) Overtime rate x difference between hours worked and 44 hours equals amount of pay for overtime.

(5) Amount of pay due for regular time plus amount of pay for overtime equals wages due under F.L.S.A.

(6) Wages due under the F.L.S.A. minus wages actually paid for week equals amount which employee was underpaid.

(7) Double the amount which the employee was underpaid equals amount due the employee for that week pursuant to Section 16(b) of the Fair Labor Standards Act.

 This formula in being applied to this case must be varied in two respects: (a) With respect to the weeks after the week of October 28, 1939, the maximum hours of work per week were lowered to 42 hours. Beginning with the week of October 28, 1940, they were lowered to 40 hours. Therefore, 42 and 40 hours, respectively, will be substituted for 44 hours in the second and fourth steps of the formula when computing the amount due for the weeks after October 28, 1939 and 1940. (b) If the hourly rate of pay was less than thirty cents per hour after October 28, 1939, or less than twenty-five cents per hour for the period from October 28, 1938, to October 28, 1939, then 30 and 25 cents should supplant during these respective periods the answer obtained in the first step of the formula. Of course, plaintiffs cannot obtain more than they are seeking in their complaints.

 I find the amount of Two Hundred and Fifty Dollars ($250) to be a reasonable attorneys' fee in the premises, to be taxed against the defendant and in favor of the plaintiffs, together with the costs herein.

Findings of fact, conclusions of law and order for judgment will be filed in accordance with this memorandum and will be made a part hereof.