**KEEN v. MID–CONTINENT PETROLEUM CORPORATION.**

No. 131.

District Court, N. D. Iowa,
Central Division.

Sept. 28, 1945.

On Motion for New Trial Nov. 21, 1945.

Leslie L. Boomhower and L. R. Boomhower, both of Mason City, Iowa, for plaintiff.

J. P. Greve, of Tulsa, Okl., for defendant.

Douglas B. Maggs, Sol., and Archibald Cox, Associate Sol., both of Washington, D.C., and Reid Williams, Regional Atty., of Kansas City, Mo., for Administrator of Wage and Hour Division, United States Department of Labor, amicus curiae.

GRAVEN, District Judge.

Case under Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., involving questions relating to statute of limitations, "engaged in commerce", interstate shipments coming to "rest", a "substantial" part of work week, mixture of intrastate and interstate duties, illness, waiver of claim, attorney's fee and interest. The question of the statute of limitations in the instant case was previously argued at length in connection with the defendant's motion to strike and for summary judgment. The opinion of this Court in overruling that motion appears in Keen v. Mid-Continent Petroleum Corporation, D.C.N.D.Iowa, 1945, 58 F.Supp. 915. The briefs and arguments of the amicus curiae in this case had to do with the question of the statute of limitations. In connection with the trial of the case on its merits the parties have re-argued and submitted additional briefs on the question of the statute of limitations. The plaintiff in this action seeks to recover "unpaid overtime compensation" and "liquidated damages" during his employment by the defendant as maintenance man for the period commencing October 24, 1938, to July 15, 1941. This action was commenced on October 5, 1944, or 3 years, 2 months and 20 days after the termination of plaintiff's employment.

During the period of plaintiff's employment and for a long time prior thereto there was in effect Section 11007, Subsection (5) of the 1939 Code of Iowa, which prescribes a five year period of limitation for actions "founded on unwritten contracts", and Subsection (6) of the same section provides a ten year period for actions "founded on" written contracts. Both of these subsections are still in effect. On March 19, 1943, the Iowa Legislature enacted Chapter 267 of the Laws of the 50th General Assembly, Section 1 of which provides as follows: "In all cases wherein a claim or cause of action has arisen or may arise pursuant to the provisions of any Federal statute wherein no period of limitation is prescribed, the holder of such claim or cause of action may commence action thereon within but not after a period of six months after March 1, 1943, if such claim or cause of action arose prior to March 1, 1943, or within but not later than six months after the accrual of such claim or cause of action if such claim or cause of action arose after March 1, 1943."

At the 1945 session of the Iowa Legislature there was enacted Senate File No. 94, which appears as Chapter 222 of the Laws of the 51st General Assembly. That Chapter repealed Chapter 267 of the Laws of the 50th General Assembly referred to, and added a new subsection to Section 11007 of the 1939 Code of Iowa, which reads as follows: "9 Those founded on claims for wages or for a liability or penalty for failure to pay wages, within two years. Any present existing causes of action must be commenced in any court of competent jurisdiction within six (6) months after the effective date of this act." The Act not bearing a publication clause went into effect as provided by the Constitution of Iowa on July 4, 1945. Iowa Constitution, Article III, Section 26. Hence Chapter 267 above referred to was repealed as of July 4, 1945. Chapter 222

is the first Iowa general statute of limitation referring specifically to wages, and actions for the recovery of wages in Iowa in the past were in general governed by the statutes of limitation relating to unwritten or written contracts. It was and is the defendant's claim that the plaintiff's action is barred by Chapter 267 heretofore referred to. While Chapter 267 has been repealed since July 4, 1945, yet it was in effect at the time the defendant filed its answer raising the defense of the statute of limitations. It is the Iowa rule that the statute of limitation in effect at the time the plea is filed that governs. Sleeth v. Murphy, 1844, Morris 321, 41 Am.Dec. 232. Thus if Chapter 267 is valid and applicable to this action, the plaintiff's action is barred. It was and is the contention of the plaintiff (1) that actions for the recovery of unpaid minimum compensation and liquidated damages under the Fair Labor Standards Act do not fall within the scope of Chapter 267, because they are actions "founded on" contract and not actions arising "pursuant to the provisions" of a Federal statute; and (2) that, if actions under the Fair Labor Standards Act are held to be actions arising "pursuant to the provisions" of a Federal statute, that Chapter 267 was invalid because (a) it discriminates against the rights bestowed by Federal statutes; (b) it, in effect, prevents the enforcement of rights bestowed by an Act of Congress and is, therefore, in conflict with the supreme law of the land; and (c) it unreasonably shortens the time within which suits may be brought and thus denies due process of law to the plaintiff.

This Court in ruling on this question in preliminary proceedings was of the view as set forth in 58 F. Supp. 915, that the plaintiff's action was essentially "founded on" contract, and was governed by the Iowa statute of limitations relating to unwritten and written contracts, and that the action was not within the scope of Chapter 267. The parties have submitted additional briefs and arguments on the question, citing a number of additional cases on the question including a number of decisions decided since the filing of the original opinion in this case. The absence of a Federal statute of limitations relating to actions under the Fair Labor Standards Act has resulted in employees included thereunder having periods of limitation from one year in Louisiana (see Loggins v. Steel Const. Co., 5 Cir., 1942, 129 F.2d 118) to twelve years in Maryland (see Bright v. Hobbs, D.C.Md.1944, 56 F.Supp. 723) in which to bring their actions. Such absence has also resulted in a contrariety of judicial opinions as to which particular statute of limitation of a particular state is applicable and as to the validity of certain such statutes. It has also resulted in a difference of views as between federal courts and state courts in the same state. See Cannon v. Miller, Wash.1945, 155 P.2d 500, and Cunningham v. Weyerhauser Timber Co., D.C.Wash.1943, 52 F.Supp. 654.

In the case of Kappler v. Republic Pictures Corporation, D.C.S.D.Iowa 1945, 59 F.Supp. 112, the District Court for the Southern District of Iowa held that Chapter 267 was not a bar to this type of action. The Court in that case in reference to Chapter 267 states commencing on page 116 of 59 F.Supp.: "It will be noted that this is a very peculiar statute as it is not a general statute of limitations but is directed only to the provisions of federal statutes. * * * The Legislature of the State of Iowa had no more right therefore to tack on this provision to the federal statutes than a city would have by ordinance to add a provision to acts of the state Legislature. It is not a question of constitutionality, but it is an attempt on the part of the Legislature of the State of Iowa to enter a field of legislation exclusively within the authority of the Congress of the United States. It is true that where there is no limitation of time in which a federal statute can be enforced the federal judiciary turns to the general statute of limitations of a state to determine the question of laches. But this rule and these decisions have nothing to do with the determination of the question of whether the Legislature of the State of Iowa had a right or authority to add to federal statutes provisions with reference to limitations on the time when actions might be maintained thereon."

In the case of Kurth v. E. H. Clark Lumber Co., Cir.Ct.Or., Dec. 18, 1944, an Oregon statute limiting to 90 days actions for "overtime or premium pay accrued or accruing, including penalties thereunder, required or authorized by any statute" was held unconstitutional because of interference with the Fair Labor Standards Act. In the case of Cannon v. Miller, Wash.1945, 155 P.2d 500, 507, the Supreme Court of Washington held that an action to recover overtime compensation and liquidated damages under the Fair Labor Standards Act is not governed by the

Washington statute, Rem.Rev.Stat.Supp. § 159, subd. 3, providing a three year period of limitations for actions "upon a contract or liability, expressed or implied, which is not in writing, and does not arise out of any writing", but is an action arising from "a liability created by statute" and governed by the statute of limitations relating to such liability. The Washington Court states that there is a distinction between its present holding and its holdings in the prior cases of Oregon-Washington R. & Nav. Co. v. Seattle Grain Co., 106 Wash. 1, 178 P. 648, 185 P. 593, and Chicago Milwaukee & St. Paul R. Co. v. Frye & Co., 109 Wash. 68, 186 P. 668, wherein suits to recover undercharges for transportation where the charges were fixed by law were held not to be actions upon a liability created by statute, but were held to be contractual in nature so far as the statute of limitations was concerned.

The Eighth Circuit Court of Appeals held in the case of New v. Denison Clay Co., 1919, 260 F. 70, that an action by a carrier to recover undercharges for transportation where the bills of lading did not specify the rate, but the rate was in effect inserted by federal statute, was an action upon a written contract so far as the statute of limitations was concerned. Accord, Bottemueller v. Wilson & Co., D.C.Mo. 1944, 57 F.Supp. 766. It would seem that if the insertion by Federal law into a contract by transportation of the amount to be paid therefor gives rise to an action on contract for such charges, that insertion by Federal law into a contract of employment of the minimum rates that must be paid therefor would analogously give rise to an action on contract.

■ In the case of Lorber v. Rosow, D.C.Conn.1944, 58 F.Supp. 341, in which the question of the statute of limitations in a Wage and Hour case was involved, the Court states on page 343 of 58 F.Supp.: "The defendant has pleaded the statute of limitations, claiming that the section * * * relating to oral contracts applies. The weight of authority appears to support this interpretation of the nature of the basis of recovery under the Act." In the case of Orminske v. Hyland Electrical Supply Co., 1945, 326 Ill.App. 392, 62 N.E. 2d 14, 16, a Fair Labor Standards Act case, it is stated: "The statute becomes a part of the employee's contract of employment, D. & L. Production Co. v. Cuniff,

Tex.Civ.App., 180 S.W.2d 205, and the 'liability is for the wages due employees under the working agreements which the federal statutes require employer and employee to make.' Loggins et al. v. Steel Const. Co., 5 Cir., 129 F.2d 118, 120." The Iowa Supreme Court has just recently announced the rule that where it is doubtful which statute of limitations is applicable that the one giving the longer period should be applied. Lincoln Nat. Life Ins. Co. v. Fischer, Iowa 1945, 17 N.W.2d 273, 281.

With the conflicting decisions by state and federal courts as to the nature of an action brought under the Fair Labor Standards Act, it would seem that it will sooner or later be authoritatively determined whether the nature of such actions is a federal question or a question of state law. The highest federal court that has specifically passed upon the question of the nature of an action under the Fair Labor Standards Act is the Sixth Circuit Court of Appeals. In the case of Northwestern Yeast Co. v. Broutin, 6 Cir., 1943, 133 F.2d 628, 631, that court held that such an action was by its nature an action on contract. That court in that case did not find it necessary to decide whether the question of the nature of the action was one of state or federal cognizance, or which holding was to govern, stating that under both the Ohio decisions and the Federal Court decisions the action was one "arising out of contract." Even if Congress should pass a law prescribing a statute of limitation for actions under the Fair Labor Standards Act, the question as to the nature of the action would still be of importance in connection with other phases. The question is of importance as to proceedings auxiliary to actions. See Northwestern Yeast Co. v. Broutin, supra (attachment) and Sections 12083 and 12085 of the 1939 Code of Iowa (attachment). It appears that in some states that easier and quicker procedure is provided in proceedings auxiliary to an action where the action is one on contract.

■ It is well established that the rights of parties under a bill of lading for an interstate shipment are federal questions. See Robinson v. Trustees of N.Y.N.H. & H.R.Co., Mass.1945, 60 N.E.2d 593. It would seem that where Congress under its power to regulate interstate commerce inserts into the contract of employment of those engaged in such commerce certain rights as to pay and hours, that the nature

128

of the rights so given are Federal questions. In the case of Brooklyn Sav. Bank v. O'Neil, April 9, 1945, 65 S.Ct. 895, the United States Supreme Court in deciding the question of the allowance of interest on judgments recovered under the Fair Labor Standards Act, 65 S.Ct. on page 906, states: "We are of the opinion that the question of the right to interest on sums recoverable under the provisions of Section 16(b) of the Act constitutes a question of federal, not local, law."

It is the holding of the Court that the plaintiff's action is not barred by Chapter 267 of the Acts of the 50th General Assembly, heretofore referred to, and that plaintiff's action is governed either by Subsection (5) of Section 11007 of the 1939 Code of Iowa providing a five year period of limitation for actions founded on unwritten contracts, or by Subsection (6) of the same section providing a ten year period of limitation for actions founded on written contracts. The plaintiff sought to establish a written contract covering the period of employment in question. It appears that in the earlier period of employment with the defendant in another capacity the plaintiff did work under a written contract, yet that during the period of employment in question he was working under an oral contract of employment, and his action is subject to the five year period of limitation. The plaintiff in this action claims overtime compensation and liquidated damages for the period from October 24, 1938, to July 15, 1941, when he terminated his employment with the defendant. The complaint in this action was filed October 5, 1944, the summons was served several days later. For the purposes of the period of limitation this action was commenced as of the date of the filing of the complaint. See cases under 28 U.S.C.A. following Section 723c, Rule 3, Federal Rules of Civil Procedure. Under the Iowa law the delivery of the original notice to the sheriff of the county in which the action is brought tolls the statute of limitations. Rule 49, Iowa Rules of Civil Procedure, Chapter 278, Laws of the 50th General Assembly. See also, Cook, Iowa Rules of Civil Procedure Annotated p. 144. The plaintiff's compensation during the period in question was on a monthly basis. It appears that in the years 1938 and 1939 the plaintiff was paid on the 15th of the month for his services up to that date and on the 1st of the month for his services

from the 16th of the month up to the end of the month.

The first question to determine is when the statute of limitations commenced to run. Section 11011 of the 1939 Code of Iowa provides as follows: "When there is a continuous, open, current account, the cause of action shall be deemed to have accrued on the date of the last item therein, as proved on the trial." There are a number of Iowa cases holding that under certain circumstances compensation for services can constitute a "continuous, open, current account", so that the statute of limitations does not commence until the last item thereof. Shorick v. Bruce, 1866, 21 Iowa 305; Wendeling v. Besser, 1871, 31 Iowa 248; Kilbourn v. Anderson, 1889, 77 Iowa 501, 42 N.W. 431; In re Oldfield's Estate, 1912, 158 Iowa 98, 138 N.W. 846; Id., 175 Iowa 118, 156 N.W. 977, L.R.A. 1916D, 1260, Ann.Cas. 1917D, 1067; Sullenbarger v. Aherns, 1914, 168 Iowa 288, 150 N.W. 71; Scott v. Wilson, 1919, 185 Iowa 464, 170 N.W. 761; Soderland v. Graeber, 1921, 190 Iowa 765, 180 N.W. 745; Wertz v. Ryan, 1921, 192 Iowa 517, 184 N.W. 1032; In re Nelson's Guardianship, 1940, 229 Iowa 666, 294 N.W. 922. See also DuBois v. City of Oskaloosa, 1940, 229 Iowa 109, 294 N.W. 302. However, it seems clear from the above Iowa cases that where the situation is such that by law the time for the payment of compensation is specified or where the situation is such that it is plainly intended that the compensation for services is to be promptly paid for periodically as the services are rendered, that such situations do not fall within the scope of Section 11011 referred to.

The decisions of the United States Supreme Court indicate that the minimum wages and overtime compensation are to be promptly paid. In the cases of Brooklyn Savings Bank v. O'Neil, April 9, 1945, 65 S.Ct. 895, on page 902, it is stated (italics supplied): "We have previously held that the liquidated damage provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages. Overnight Motor Transp. Co. v. Missel, 1942, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682. It constitutes a Congressional recognition that failure to pay the statutory minimum *on time* may be so detrimental to maintenance of the minimum standard of living

'necessary for health, efficiency, and general well-being' of workers' and to the free flow of commerce, that double payment must be made *in the event of delay* in order to insure restoration of the worker to that minimum standard of well-being.[20]" Footnote 20 reads in part as follows: "The necessity of prompt payment to workers of wages has long been recognized by Congress as well as by state legislatures."

In the case of Rigopoulos v. Kervan, 2 Cir., 1943, 140 F.2d 506, on page 507, 151 A.L.R. 1126, of the Federal Reporter citation it is stated: "Section 7 of the Act, 29 U.S.C.A. § 207, plainly contemplates that overtime compensation shall be paid in the course of employment and not accumulated beyond the regular pay day."

It is the holding of the Court that a claim of an employee for overtime compensation and liquidated damages in Fair Labor Standard Act cases does not constitute a "continuous, open, current account," under the provisions of Section 11011 above referred to. An employer becomes liable for any overtime compensation on the next regular pay day covering the period of employment during which the overtime was put in. Smith v. Continental Oil Co., D.C.N.Y. 1945, 59 F.Supp. 91. Antedating back five years from October 5, 1944, under the statute relating to unwritten contracts, gives the date of October 5, 1939. Thus the plaintiff can only recover for the overtime that should have been paid on pay days from and after October 5, 1939. The first regular pay day after October 5, 1939, was October 15, 1939, which pay day covered the period from October 1, 1939, to and including October 15, 1939. It is the holding of the Court that any claim of the plaintiff for overtime compensation and liquidated damages based upon services rendered prior to October 1, 1939, is barred by the statute of limitations.

The next question is as to whether the duties of the plaintiff were such as to bring him within the scope of the Act. It has been authoritatively stated that the coverage of the Act depends upon the character of the activities of a particular employee rather than upon the nature of the business of the employer. Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Warren-Bradshaw Co. v. Hall, 1942, 317 U.S. 88, 63 S. Ct. 125, 87 L.Ed. 83; Overstreet v. North Shore Corporation, 1943, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 1944, 141 F.2d 331. It is believed that the rule in effect means that an employer can engage in both interstate and intrastate activities without bringing under the Act those employees engaged in intrastate activity, and that the individual employee is the unit for determining coverage or non-coverage under the Act. However, an individual employee could hardly establish the interstate character of his activities without showing the kind and nature of the business or activity in which his employer was engaged. The nature of the activities and of the business of the defendant in the instant case is therefore of importance. The defendant is a foreign corporation which operates an oil refinery at Tulsa, Oklahoma. The defendant is a distributor of gasoline, kerosene and lubricating oil in a number of states including Iowa, Minnesota, Wisconsin, Illinois and Nebraska. The area the defendant operates in is divided into divisions. The Northern Division of the defendant included all of the state of Iowa, the southwestern part of Wisconsin, the northern part of Illinois, the southern part of Minnesota, and the eastern part of Nebraska. That division is managed from a regional office located at Waterloo, Iowa. The defendant distributes the petroleum products mentioned in the Northern Division by means of around 150 bulk plants and several hundred retail outlets. The retail outlets consist principally of service stations and tank truck operators. The bulk plants are wholesale distribution points and not retail outlets. As to the desirability as to the tax situation in keeping the bulk plants as non-retail establishments see, Iowa Chain Store Tax case of Phillips Petroleum Co. v. Nelson, 1942, 232 Iowa 246, 5 N.W.2d 1. The defendant operated on an extensive scale and during the period in question distributed large quantities of petroleum products in the area referred to. The plaintiff's services for all practical purposes were rendered in the states of Iowa, Minnesota and Wisconsin. All of the petroleum products distributed by the defendant came in from other states. The defendant held either by ownership or lease a large number of service stations which with few exceptions it leased or subleased to local operators who sold the defendant's petroleum products at retail. Such stations were referred to as company service stations. The defendant itself did

during the period in question operate two or three retail service stations.

However, it is believed that such retail operations of the defendant were not sufficient to make the defendant a combined wholesaler-retailer within the scope of A. H. Phillips, Inc., v. Walling, 1945, 324 U.S. 490, 65 S.Ct. 807, or Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 1944, 141 F.2d 331. It is believed that it is a fair inference that the defendant only operated such retail service stations until a local operator could be procured. There were some service stations handling the defendant's products of which the defendant was not the owner or lessor. Such stations were referred to as private stations. By virtue of some arrangement or understanding the defendant maintained and kept in repair the service station equipment used in connection with the retail sale of its products at the so-called company stations and at some at least of the so-called private stations. The defendant's relation to the so-called company service stations differed somewhat from the relation of the ordinary independent wholesaler in that the operators of such retail outlets were either lessees or sublessees of the defendant. However, the nature of the control of the defendant over such retail outlets does not appear, so that it cannot be held that the defendant is a hybrid wholesaler-retailer within the scope of Phillips v. Walling, supra. The status of the defendant so far as this phase of the case is concerned, is that of an independent wholesaler. The defendant in addition to distributing petroleum products coming from its own refinery, purchased such products at other sources and distributed them. Large amounts of kerosene and lubricating oil were distributed by the defendant, but the greater part of the petroleum products distributed by it consisted of gasoline. Approximately 90 per cent of the gasoline distributed by the defendant in Iowa came in by pipe line, and around 85 to 90 per cent of the gasoline distributed by it in Minnesota came in by pipe line. None of the gasoline distributed by it in Wisconsin came in by pipe line. All of the kerosene distributed by the defendant in the states mentioned was shipped in by railroad tank cars from other states. Around 10 per cent of the gasoline distributed by the defendant in Iowa and from 10 to 15 per cent of the gasoline distributed by the defendant in Minnesota, and all of the gasoline distributed by the defendant in Wisconsin came in by railroad tank cars from other states. The pipe line gasoline is all handled by one pipe line company which is a common carrier. The pipe line company had a pipe line commencing in the southwestern part of the United States and extending up to St. Paul, Minnesota. The pipe line gasoline had its origin in the states of Kansas and Oklahoma, only gasoline was handled by means of pipe line. At a point or points in the different states the pipe line company maintained terminals at which the gasoline could be drawn out of the pipe line into storage tanks, until it proceeded to its ultimate destination within the state by means of railroad tank cars and truck transports. The defendant during the period in question did not use truck transports for such purpose. The pipe line terminals in Iowa during the period in question were located at Coralville, Des Moines, and Carter Lake in the southern part of the state. In Minnesota the pipe line terminal was at St. Paul. Upon the defendant tendering so many thousand barrels of gasoline of a certain grade to the pipe line company in Oklahoma, the defendant was given credit for the same number of barrels of the same grade at a particular pipe line terminal which was subject to withdrawal by the defendant. The defendant generally built up sufficient credits in this manner with the pipe line company to take care of its anticipated need of gasoline for a period of from 20 to 30 days. No particular tank or tanks at the pipe line terminal were set aside or designated for the gasoline to go to the defendant. The gasoline at the pipe line terminal was in one common mass from which the defendant and the other oil companies having credits for gasoline tendered could withdraw gasoline up to the amount of such credits. During the period in question the defendant had the gasoline withdrawn by it from the pipe line terminals loaded into railroad tank cars for transportation to its different bulk plants within the state. While the ultimate destination of the gasoline put into the pipe line was the bulk plants of the defendant and other oil companies using the pipe line, yet until the defendant loaded the gasoline into railroad tank cars at the pipe line terminal, the particular bulk plant which was its ultimate destination was, not designated. None of the pipe line gasoline received by the defendant came in under response for specific orders, but came in to meet the anticipated demands of the defendant's dis-

tributors in general. It appears that some gasoline was blended at the pipe line terminal and that sometimes at such terminal a dye was put into certain of the gasoline to give it a distinctive color, and that in some instances the gasoline was "seasoned." By "seasoned" is meant to bring up the volatility of the gasoline appropriate to the season.

The defendant had approximately 115 bulk plants in Iowa and 3 in that part of Minnesota included in the defendant's Northern Division, and around 6 in that part of Wisconsin included in the same division. It was the duty of the plaintiff as maintenance man to service 63 of such bulk plants in those areas, and to service the greater part of the service stations served by such bulk plants. While on one or two occasions during the period in question the plaintiff put in some time in Wisconsin, yet the overwhelming amount of his services were rendered in the states of Iowa and Minnesota. The bulk plants of the defendant were situated alongside railroad tracks. The bulk plants always had tanks for the reception of gasoline, and usually had such tanks for kerosene. At each bulk plant there was a warehouse for the reception and storage of lubricating oils. At the bulk plants there were quite a large number of pipes set in concrete which were so arranged that a pipe could be extended from the reception tanks to a point above the height of a tank car sitting on the railroad track. To unload the contents of a tank car into the reception tank or tanks a stub pipe is connected on to the extended pipe and inserted into the gasoline or kerosene in the tank car. Pump or pumps operated by either gasoline engines or electric motors then pump the gasoline or kerosene from the tank car into the proper reception tanks. The kerosene and gasoline was hauled from the tanks by tank trucks to the service stations and other local customers of the defendant. The plaintiff's duties consisted of inspecting and keeping in repair the bulk plants in the area assigned to him and in inspecting and keeping in repair the service station equipment of the service stations assigned to him. The plaintiff was employed for the purpose of performing such duties, and such duties were a uniform, recurring and regular part of his employment. In connection with the bulk plants it was plaintiff's duty to check over and inspect the engines, motors, pumps and other equipment used in unloading kerosene and gasoline to see that they were in proper working condition and that they were kept in such condition, and to inspect such plants as to safety conditions. Without the facilities at the bulk plants the defendant's gasoline and kerosene could not be unloaded from the railroad tank cars. The unloading of such tank cars at such bulk plants was essential, vital and indispensable to the defendant's business. Without the services of the plaintiff those unloading facilities would not have continued usable for unloading purposes, and the plaintiff's services were essential, vital and indispensable to such unloading. It was his duty in connection with such bulk plants to keep them in a proper state of repair. Such repair work included the repairing of damage done when foreign objects got into the facilities in the unloading process, replacing broken and worn-out valves and valve stems, replacing and repairing damaged or broken pipes and pipe lines, repairing and overhauling and keeping in working condition the pumps, engines and motors used for pumping, caulking seams and otherwise preventing leaks in tanks. While the plaintiff also had the duty of installing of bulk plants, yet during the period in question not much of such work was done, and the installation work had mostly to do with installing new equipment to replace damaged or worn-out equipment. By way of summary it can be stated that the plaintiff's duties during the period in question in connection with bulk plants were to keep the facilities so functioning that gasoline and kerosene could be properly and safely unloaded from the railroad tank cars into the reception tanks and to keep the reception tanks in condition to receive such gasoline and kerosene.

It was the duty of the plaintiff in connection with service stations to inspect and keep in repair and in a safe and proper operating condition, the pumps, tanks, air compressors, air lines and gasoline lines used in connection therewith. The defendant furnished the plaintiff a truck specially fixed and equipped for his maintenance work containing the space and arrangements for the necessary tools, pipes, fittings and repair parts. The items needed by the plaintiff in the performance of his duties were furnished by the defendant. The plaintiff spent a part of his time in keeping the truck in operating condition. The plaintiff spent part of his time selecting, ordering, securing, sorting and arranging the necessary materials, supplies

and repair parts needed for his maintenance work. The bulk plants and service stations assigned to the plaintiff were scattered over a considerable area. The plaintiff spent considerable time traveling by means of the truck referred to, to the different points where such bulk plants and service stations were located. Frequently on the same trip the plaintiff would work at several bulk plants or several service stations, or work at both bulk plants and service stations.

The plaintiff was required by the defendant to fill out and turn in a maintenanceman's daily report which listed in detail the nature and extent of the work done, the time spent, and the materials used at each particular bulk plant or service station. This report also showed how much time was spent in travel, how much time was spent on the truck, how much time was spent on assembling and arranging repair parts and other items and showed in detail how the plaintiff spent his time. The defendant charged or allocated against each particular bulk plant or service station the time the plaintiff spent at such plant or station. The defendant did not charge or allocate to any particular bulk station or service station the time spent by the plaintiff in traveling, making reports, keeping the truck in repair, or in assembling and arranging materials and repair parts. The plaintiff during working hours was always on call to render whatever regular or emergency service was needed at the different bulk plants and service stations. The plaintiff furnished what was somewhat analogous to stand-by service as to bulk plants and service stations, and somewhat analogous to that of a "trouble-shooter."

The defendant at its ordinary bulk plant had storage capacity for from 50,000 to 60,000 gallons of gasoline. At an ordinary bulk plant of the defendant, railroad tank cars of gasoline arrived and were unloaded every 10 to 15 days; railroad tank cars of kerosene would arrive and be unloaded every 30 to 60 days; and the defendant received shipments of lubricating oil every 90 to 120 days. Part of the lubricating oil was shipped by drums and part by tank cars. The defendant carried sufficient gasoline at a particular bulk plant to meet the anticipated demands for from 20 to 30 days, and carried supplies of kerosene and lubricating oil to meet anticipated demands for a somewhat longer period. The shipments of gasoline, kerosene and lubricating oil to the various bulk plants were not made in response to any specific orders from the defendant's customers, but were made in anticipation of such orders. The defendant's customers appear to have constituted a large and fairly stable group. The proportion of kerosene handled by the defendant through its bulk stations to that of gasoline was not directly testified to. However from the testimony as to the relative frequency of shipments it would seem that the proportion of such gasoline to that of kerosene was about three or four to one, and that the kerosene handled through the bulk stations amounted to at least 25 per cent of the gasoline handled. In the case of gasoline from 10 to 15 per cent of it came directly in railroad tank cars from other states. All of the kerosene handled came directly in railroad tank cars from other states. The proportion of lubricating oil handled by the defendant at its bulk plants in proportion to kerosene and gasoline does not directly appear, but it is believed that it is a fair inference that the total gallonage of lubricating oil handled by the defendant at its bulk plants was small in proportion to the gallonage of gasoline and kerosene. The lubricating oil that came by tank cars apparently came to the defendant's warehouses at Waterloo and Des Moines, Iowa. It appears that from 35 to 40 per cent of the total gallonage of kerosene and gasoline handled by the defendant at its bulk plants during the period in question, came direct by railroad tank cars from other states, and that from 60 to 65 per cent of such gallonage came by railroad tank cars loaded at pipe line terminals within the state.

■■■■ The Fair Labor Standards Act, 29 U.S.C.A. § 206, includes those employees "engaged in commerce or in the production of goods for commerce." At 29 U.S.C.A. § 203(b) commerce under the Act is defined to mean "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." In the instant case the plaintiff was obviously not engaged in the "production of goods for commerce," and if included under the Act his inclusion would have to be by virtue of the term "engaged in commerce." The plaintiff in order to be included within the term "engaged in commerce" has the burden of establishing that he was actually engaged in the movement of goods in commerce or activities so closely related thereto as to be practically a part of it. McLeod

v. Threlkeld, 1943, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538. In the case of Armour & Co. v. Wantock, 1944, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. ——, on page 131 of the United States citation, on page 168 of 65 S.Ct., it is stated: "the test of whether one is in commerce is obviously more exacting than the test of whether his occupation is necessary to production for commerce." See also, Basik v. General Motors Corporation, 1945, 311 Mich. 705, 19 N.W. 2d 142, 145. It seems that the present trend of the United States Supreme Court decisions are to give a very wide scope to the term of "production of goods for commerce" (see, Borden Co. v. Borella, 1945, 65 S.Ct. 1223) and a rather restricted scope to the term "in commerce." Therefore, an employee who seeks to recover under the Act on the basis of being engaged "in commerce" has in general a more difficult task than one who seeks to recover on the basis of being engaged in "production of goods for commerce."

 In cases like the instant case where the business of wholesaling is involved, it becomes a question of importance when the interstate phase of the business ends and the intrastate phase begins. See note, Fair Labor Standards As Applied to Wholesalers, 31 Georgetown Law Journal 450. In the case of Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460, the United States Supreme Court held that those employees of a wholesaler, a substantial part of whose duties involved the procurement or receipt or delivery or otherwise handling goods from other states shipped pursuant to prior orders of the local customers, were included in the Act, but that the employees having to do with the delivery of goods to local customers from regular stocks shipped from other states to meet the needs of such local customers in general without any prior order, were not within the Act. The Court goes on to state on page 570 of the United States citation, on page 336 of 63 S.Ct.: "We do not mean to imply that a wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts, might not at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce' within the meaning of the Act." The Eighth Circuit Court of Appeals holds that where goods are shipped in by a wholesaler from other states and are placed in a warehouse to meet anticipated needs of its local customers but not to meet prior orders, that they come to rest in the warehouse so far as interstate movement is concerned, and that activities of employees in connection with such goods thereafter are not within the Act. Schwarz v. Witwer Grocer Co., 8 Cir., 1944, 141 F.2d 341, certiorari denied 322 U.S. 753, 64 S.Ct. 1265, 88 L.Ed. 1583; Kantar v. Garchell, 8 Cir., 1945, 150 F.2d 47. Therefore, it is held that the activities of the plaintiff in the instant case at service stations were activities having to do with the petroleum products after they had lost their interstate character by a break in the continuity of shipment, and were not within the Act. Accord: Daly v. Citrin, D.C.Mich. 1943, 53 F.Supp. 876.

The next question is as to at what prior point or points, if any, in the instant case the petroleum products arriving by railroad tank cars, came to rest. Since the defendant was not the common carrier and since the activities of the plaintiff at the bulk plants were at the receiving end, there is presented the question as to unloading of a shipment as a part of the transportation of it. In the case of Fleming v. Jacksonville Paper Co., 5 Cir., 1942, 128 F.2d 395, modified as to other phases by Walling v. Jacksonville Paper Co., supra, the Fifth Circuit Court of Appeals on page 398 of 128 F.2d states: "The unloading at destination of an interstate shipment is work in interstate transportation, whether done by the carrier or another." In the case of Walling v. Consumers Co., 7 Cir., 1945, 149 F.2d 626, on page 629, another Fair Labor Standards Act case, the Court states: "Neither the switch track nor the cars in which goods are carried are a place of rest or final destination," and commencing on the same page that Court further states: "Unloading of an interstate shipment is so closely related to interstate transportation as to be an integral or component part of the interstate journey." Therefore, it is held in the instant case that the unloading of the petroleum products from the railroad tank cars was an integral and component part of the transportation and shipment of such products, and that such transportation was not completed until such products reached the inside of the tanks maintained by the defendant at its bulk plant stations, and that such tanks constituted the place of rest for such products. It is clear and it is so held in the instant case that the shipments of petroleum products during the period in question, coming all the way

by tank cars from other states, constituted interstate shipments. The parties are in disagreement, first as to the nature of those shipments arriving by railroad tank cars from the pipe line terminals, and secondly, the effect thereof upon plaintiff's right of recovery. It is the claim of the defendant that such shipments came to rest at the pipe line terminals and lost their interstate character at such terminals, and next that without such shipments being classed as interstate in character the plaintiff cannot recover. It is the claim of the plaintiff (1) that the gasoline did not lose its interstate character at the pipe line terminal, and (2) that if it did that the amount of gasoline and kerosene that came direct in railroad tank cars from other states was so large that the defendant's handling of it must be regarded as the engaging in interstate commerce in a substantial way. It would seem that the contention in effect of the defendant is that the pipe line terminals broke the continuity of the interstate shipment in the same manner as the warehousing of goods not received in response to prior order did in the cases of Walling v. Jacksonville Paper Co., supra, and Schwarz v. Witwer Grocer Co., supra. While the stoppage of interstate goods by warehousing may break the continuity of the interstate shipment under the rule laid down in the case of Walling v. Jacksonville Paper Co., supra, yet not every stoppage of an interstate shipment breaks its continuity. In the case of Walling v. Jacksonville Paper Co., supra, 317 U.S. on page 568, 63 S.Ct. on page 335, 87 L.Ed. 460, the United States Supreme Court states: "The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act. As in the case of an agency (cf. De Loach v. Crowley's, Inc., 5 Cir., 128 F.2d 378) if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destination, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce." In the same case on page 569 of the United States citation, on page 336 of 63 S.Ct., 87 L.Ed. 460, it is stated: "* * * the circumstance that title to the goods passes to respondent on the intermediate delivery does not mean that the interstate journey ends at the warehouse." In the case of Glasgow & Lazarus v. Duncan,[1] D.C.W.D.Tenn., J. Boyd, May 5, 1943, the Court held as follows in its ninth conclusion of law: "Where gasoline previously had been delivered from out of the state to the tanks of an independent storage company in the city of Memphis, Tennessee, and co-mingled with other gasoline of the same grade, warehouse employee engaged in inspecting and receiving such gasoline at his employer's bulk plant in the city of Memphis, Tennessee, from such storage tanks is engaged in commerce within the meaning of the Fair Labor Standards Act of 1938, since it was the intention of the original shipper of the gasoline from out of the State that same was to remain in storage only temporarily and until the demands of its agent's business required that it be removed from the storage tanks, thus completing its interstate movement."

The defendant strongly relies upon the case of State v. Continental Oil Co., 1944, 218 Minn. 123, 15 N.W.2d 542. In that case a divided court held that interstate gasoline stopping at a pipe line storage tank under circumstances somewhat similar to those in the instant case lost its interstate character because of such stopping and became subject to state taxation. In Walling v. Jacksonville Paper Co., supra, 317 U.S. on page 569, 63 S.Ct. on page 336, 87 L.Ed. 460, the United States Supreme Court referring to the Fair Labor Standards Act said: "But as we stated in Kirschbaum Co. v. Walling, 316 U.S. 517, 520, 521, 62 S.Ct. 1116, 1118, 1119, 86 L.Ed. 1638, decisions dealing with various assertions of state or federal power in the commerce field are not particularly helpful in determining the reach of this Act." As to interstate shipments coming to rest see Mid-Continent Pipe Line Co. v. Hargrave, 10 Cir., 1942, 129 F.2d 655 (stop of crude oil for refining and processing). See also, 60 A.L.R. 1466; Allesandro v. C. F. Smith Co., 6 Cir., 136 F.2d 75, 149 A.L.R. 386; 155 A.L.R. 936. Davisson, Coverage of Fair Labor Standards Act, 41 Michigan Law Review 1060.

It is the holding of the Court in the instant case that the interstate move-

---

[1] No opinion for publication.

ment of the gasoline that came in by pipe line was not broken at the pipe line terminal, and that the stopping there was but a convenient intermediate stop in such transportation.

However, it would not be decisive of the plaintiff's coverage under the Act as to his bulk plant activities whether the pipe line gasoline did or did not lose its interstate character at the pipe line terminal, for without such pipe line gasoline from 35 to 40 per cent of the total gallonage unloaded at the defendant's bulk plants arrived by railroad tank cars direct from other states. It is the view of the Court in the instant case that excluding the gasoline that came in by pipe line that defendant's handling of the interstate shipments of gasoline and kerosene that came in direct from other states by railroad tank car, that the defendant must be held to have been engaged "in commerce" within the scope of the Fair Labor Standards Act. It is further the view of the Court that a much lower percentage than the amount stated above would be sufficient to sustain a holding that the defendant was so engaged. In the case of United States v. Darby, 1941, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, a Fair Labor Standards Act case, the United States Supreme Court on page 123 of the United States citation on page 461 of 61 S.Ct., states: "Congress * * * has made no distinction as to the volume or amount of shipments in the commerce * * * by any particular shipper or producer." In the case of New Mexico Public Service Co. v. Engel, 10 Cir., 1944, 145 F.2d 636, 640, in a Fair Labor Standards Act case in which only 4% of the employer's activities were of an interstate character the Court stated: "It is true, of course, that the percentage of electricity used in interstate commerce is small, but it is not the volume or percentage of an employee's contribution to the movement of commerce which is the test of whether he is 'engaged in commerce' within the meaning of the Act." See also, Schmidt v. Peoples Telephone Union of Maryville, Mo., 8 Cir., 1943, 138 F.2d 13.

It being clear that the defendant was engaged "in commerce" as to the unloading of interstate shipments at its bulk plants, the next question is whether the plaintiff as its employee was so engaged during any part of the period in question. In the case of Overstreet v. North Shore Cor-

poration, 1943, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656, commencing on page 128 of the United States citation, on page 497 of 63 S.Ct., the United States Supreme Court states: "A practical test of what 'engaged in interstate commerce' means has been evolved in cases arising under the Federal Employers' Liability Act (45 U.S.C. § 51 et seq., 45 U.S.C.A. § 51 et seq.) which, before the 1939 amendment (see 53 Stat. 1404, 45 U.S.C.A. §§ 51, 54, 56, 60), applied only where injury was suffered while the carrier was engaging in interstate or foreign commerce and the injured employee was employed by the carrier 'in such commerce.' 35 Stat. 65. In determining the reach of that phrase, the case of Pedersen v. Delaware, L. & W. R. Co., 229 U.S. 146, 33 S.Ct. 648, 57 L.Ed. 1125, Ann. Cas.1914C, 153, held that an employee who was injured while carrying bolts to be used in repairing a railroad bridge over which interstate trains passed was engaged in interstate commerce within the meaning of the Liability Act." In the case of McLeod v. Threlkeld, 1943, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, on page 495 of the United States citation, on page 1250 of 63 S.Ct., the Court states: "However, the test of the Federal Employers' Liability Act that activities so closely related to interstate transportation as to be in practice and legal relation a part thereof are to be considered in that commerce, is applicable to employments 'in commerce' under the Fair Labor Standards Act. The effect of the over-refinement of factual situations which hampered the application of the Federal Employers' Liability Act, prior to the recent amendment, we hope, is not to be repeated in the administration and operation of the Fair Labor Standards Act." In the case of J. F. Fitzgerald Construction Co. v. Pedersen, infra, the United States Supreme Court held that employees of a contractor who had a contract with a railroad company to repair bridges over which interstate trains passed "were engaged in commerce" under the Fair Labor Standards Act. That case was before the United States Supreme Court on two occasions. In 318 U.S. 740, 742, 63 S.Ct. 558, 87 L.Ed. 1119, the holdings of the New York courts to the contrary were reversed upon the authority of Overstreet v. North Shore Corporation, supra. On petition for rehearing the judgment was amended to permit the determination of the nature of the employment of the members of the class bringing the suit. Upon remand to

the state court judgment was entered in favor of the employees and upon review of that judgment it was affirmed. 324 U.S. 720, 65 S.Ct. 892. In this last opinion the United States Supreme Court on page 893 of 65 S.Ct. states that the Fair Labor Standards Act was applicable to "employees engaged in the actual repair of a facility of interstate commerce." In the cases of Overstreet v. North Shore Corporation, supra, and in McLeod v. Threlkeld, supra, the United States Supreme Court stated that the term "engaged in commerce" under the Fair Labor Standards Act should be construed similar to the term "employed in commerce" appearing in the Federal Employers' Liability Act prior to the 1939 amendment. In the case of Overnight Motor Transportation Co. v. Missel, supra, a rate clerk employed in the office of an interstate motor carrier was held to be engaged "in commerce" under the Fair Labor Standards Act, while in the later case, McLeod v. Threlkeld, supra, a cook engaged in preparing meals for maintenance-of-way workers of an interstate railroad was held not to be within the Act. Some courts are of the view that a different test of coverage was applied in the two cases and that the two cases are not in harmony with each other or with previous United States Supreme Court decisions under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., and that the later case, McLeod v. Threlkeld, is the more restricted as to coverage. Rucker v. First Nat. Bank of Miami, Okl., 10 Cir., 1943, 138 F.2d 699, 703, 704, certiorari denied 321 U.S. 769, 64 S.Ct. 524, 88 L.Ed. 1065. There are others who are of the view that there is no satisfactory ground of distinction between the cases just referred to, but who are of the further view that McLeod v. Threlkeld, supra, marks the limits of the restricted scope given to the term "engaged in commerce" under the Fair Labor Standards Act. See Verleger, Some Problems under the Fair Labor Standards Act, 31 California Law Review 415, 418. As indicative of the broader coverage given under the Act under the term "engaged in * * * production of goods for commerce" as contrasted to the coverage given by the term "engaged in commerce," it should be noted that in the case of Hanson v. Lagerstrom, 8 Cir., 1943, 133 F.2d 120, the Eighth Circuit Court of Appeals held that a cook engaged in preparing meals for a lumbering crew engaged in production of goods for interstate commerce was within

the Act. See also Basik v. General Motors Corporation, 1945, 311 Mich. 705, 19 N.W. 2d 142.

The decisions under the Federal Employers' Liability Act which were thought to be of help in construing the term "engaged in commerce" under the Fair Labor Standards Act are so varied and in many instances so seeming in conflict with each other, that the application of them to cases under the Fair Labor Standards Act presents difficulties. The defendant cites and relies upon, among other cases under the Federal Employers' Liability Act, the case of Pennsylvania R. Co. v. Manning, 3 Cir., 1932, 62 F.2d 293, certiorari denied 289 U.S. 738, 53 S.Ct. 657, 77 L.Ed. 1485, where a railroad employee was denied recovery for injuries under that Act. The situation in that case and the reason for the denial of recovery appear on page 295 of the Federal Reporter citation, where the Court states: "Coming to the present case, Manning, at the time he received his injuries, was inspecting an electrical motor that furnished the power to a crane which loaded and unloaded cars used in both interstate and intrastate commerce. Was he engaged in interstate transportation or in work so closely related to it as to be practically part of it? Under the doctrine declared in the above cases, he was not, for his work was merely incidental to the work which the crane did and it might or might not have been primarily used in aid of interstate transportation." It is believed that the work of the plaintiff in the instant case was so much more closely connected with the unloading of interstate shipments than the employee in the case just referred to that the situations are distinguishable.

Without attempting to determine whether there is conflict between the United States Supreme Court decisions relating to coverage under the Fair Labor Standards Act under the term "engaged in commerce," it is believed that the coverage given under that term is more restricted than that given under the term "engaged in * * * production of goods for commerce." It is further believed that while decisions under the Federal Employers' Liability Act prior to the 1939 amendment are to be considered in construing coverage under the term "engaged in commerce" under the Fair Labor Standards Act, yet the more realistic of the decisions under the Federal Employers' Liability Act are to be followed, and not such of those decisions as constitute the "over-refinement of factual situ-

ations" referred to in *McLeod v. Threlkeld*, supra.

█ Approaching the situation in the instant case realistically, it is plain that the unloading of the interstate shipments of petroleum products at the defendant's bulk plants was vital and necessary and indispensable to the completing of the interstate journey, and that without the plaintiff's services at such bulk plants that the interstate shipments could not continue to be unloaded. It is the holding of the Court that the plaintiff's activities at the bulk plants of the defendant during the period in question were so closely and intimately related to and connected with the interstate shipment of goods as to constitute an essential and component part of the interstate movement of such goods, and that as to such activities the plaintiff was engaged in commerce under the provisions of the Fair Labor Standards Act. The case of *Walling v. McCrady Construction Co.*, D.C. Pa.1945, 60 F.Supp. 243, is of interest in this connection. That case involved the coverage under the Act of the employees of a contractor. The Court in that case on page 248 of 60 F.Supp. states: "The next phase of the case relates to activities of defendant's employees in repairing motor carrier facilities. Under contract with Motor Freight Express, Inc., defendant's employees resurfaced the concrete apron about a loading dock, and excavated for an additional gasoline tank at the terminal of the Motor Freight Express, Inc. This corporation is engaged in interstate commerce. All goods carried by it move interstate. The loading and unloading thereof is interstate commerce. See *Fleming v. Jacksonville Paper Co.*, 5 Cir., 128 F.2d 395, 398, affirmed 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460. The concrete apron which defendant's employees resurfaced was a facility by which this commerce was carried. We hold therefore that the employees resurfacing this apron were engaged in commerce and covered by the Act. The extension of facilities for fueling the trucks at this terminal was also a mere addition to an existing facility of interstate commerce." It is also of interest to note that in *Walling v. Mid-Continent Pipe Line Co.*, 10 Cir., 1944, 143 F.2d 308, it was held that maintenance employees of a pipe line company were held to be engaged in "production of goods for commerce" within the scope of the Act.

█ It is the view of the plaintiff that because he drove across state lines to work on service stations that thereby his service station work took on an interstate character. An employee can engage in the production of goods for interstate commerce or engage in interstate commerce without crossing a state line. An employee can cross state lines to do purely intrastate work. For example a journeyman piano tuner may cross state lines repeatedly tuning pianos for local householders without being engaged in production of goods for interstate commerce or in interstate commerce. The test would seem to be as to what activities an employee was engaged in after he crossed the state line, unless of course he was transporting goods across the state line. It is believed that the character of work the plaintiff did at service stations in other states was not changed by the fact that he crossed state lines to perform such work. The plaintiff at times carried across state lines repair parts and other material needed in connection with his work, but such items were so few and small as to be without legal significance.

█ It is not necessary that an employee spend his whole time "in commerce" to be within the Act. If a substantial part of his work is "in commerce" he comes within the scope of the Act. *Fleming v. Jacksonville Paper Co.*, supra; *Fleming v. Knox*, D.C.Ga.1941, 42 F.Supp. 948. Where an employee is engaged in both intrastate and interstate work in order to recover under the Act he must establish what part of his work was interstate work and that a substantial portion of his activities were in the interstate work. *Schwarz v. Witwer Grocer Co.*, 8 Cir., 1944, supra. Under the Fair Labor Standards Act a single work week is the standard. Interpretative Bulletin No. 4, November 1940, Office of the Administrator of the Wage and Hour Division. The Act itself, 29 U.S.C.A. § 207, treats a week as the unit. *Overnight Motor Co. v. Missel*, supra. If a substantial part of the activities of any employee is "in commerce" he must be paid for all of his time for that week as prescribed by the Act. *Lorber v. Rosow*, D.C.Conn.1944, 58 F.Supp. 341; *Colbeck v. Dairyland Creamery Co.*, S.D.1945, 17 N.W.2d 262, 264. In 56 Harvard Law Review it is stated that any other holding than the one just stated would permit an employer engaged in both intrastate and interstate commerce to evade the Act by working the necessary employees

138

up to 40 hours a week on interstate work and then shifting them over to intrastate work for a much longer week without overtime pay.

██ In the instant case the plaintiff's ordinary and regular work day consisted of 9 hours, and his regular and ordinary work week consisted of six days. The plaintiff frequently worked in excess of 9 hours a day, and on occasions worked as many as 13 hours a day when exigencies or emergencies so required. No attempt was made by either the plaintiff or the defendant to allocate the plaintiff's compensation between interstate or intrastate activities. The amount of time the plaintiff put in at bulk plant work varied greatly. Some weeks the greater part of his time was put in at bulk plant work, and in other weeks only a few hours were so put in, and in other weeks no time was listed in plaintiff's reports as having been so put in. The greatest number of hours listed as having been put in at bulk plant work was for the week of October 21st, 1940, when 32½ hours were so listed. In certain other weeks around 25 hours of time was so listed. It has been heretofore noted that in connection with his duties the plaintiff put in considerable time traveling, making out reports, keeping repair truck in condition, and in ordering, assembling, sorting and arranging supplies, materials and repairs. It is believed that it could be considered that a proper proportion of the total time so spent could well be allocated to his bulk plant work.

██ It is the claim of the plaintiff that the term "substantial" as used in connection with "substantial part of a work week" refers to any amount in excess of that time to which the maxim "de minimis non curat lex" would be applied. However, that would in effect give the same scope to the Fair Labor Standards Act as to the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. In the latter Act the term "affect commerce" is used. Congress did not intend to give the same scope to the term "engaged in commerce" as it did to the term "affect commerce". Noonan v. Fruco Const. Co., 8 Cir., 1943, 140 F.2d 633; Brown v. Minngas Co., D.C.Minn.1943, 51 F.Supp. 363, 369. It seems that in order to be within the scope of the Fair Labor Standards Act that the activities of an employee "in commerce" must be more extensive than just to pass the so-called "de minimis" mark, and that they shall pass that mark sufficiently to be classed as "sub-stantial". While it can be argued that the difference of what is more than "de minimis" and what is "substantial" approaches the field of metaphysics, yet it would seem that there is a difference, and that under the Fair Labor Standards Act that the time spent by an employee "in commerce" could be more than "de minimis" without being "substantial", and that there is an area in which the activities can be more than "de minimis" and still be "unsubstantial" so far as the Fair Labor Standards Act is concerned.

It seems that what time or portion of time spent by an employee "in commerce" could be classed as passing from unsubstantial to substantial, could be affected by the nature and conditions of employment. In the case of New Mexico Public Service Co. v. Engel, 10 Cir., 1944, 145 F.2d 636, 640, in a Fair Labor Standards Act case, the Court in referring to the plaintiff employee states: "If the services he performs are essential to the movement of commerce and not merely sporadic and isolated, he is engaged in commerce within the meaning of the Act." In the case of Brown v. Minngas Co., D.C.Minn.1943, 51 F.Supp. 363, there was presented a situation somewhat similar to the instant case in that the portion of the particular employee's time spent in interstate activities varied greatly from week to week. The Court in that case on page 369 of 51 F.Supp. states: "In the instant case the plaintiffs worked in commerce within the meaning of the Act only fifteen minutes some weeks. Other weeks they worked thirty minutes; others forty-five minutes; others one hour; and so on until some weeks they worked over twenty hours in commerce within the meaning of the Act. In several weeks Virgil Brown worked over 45 hours in commerce. There is no logical point where it can be said that a sufficient difference exists between the hours spent one week and the number of hours spent another week so as to justify a holding that one week the plaintiff was not within the Act and another week he was. Further, defendant's interstate sales have ranged from 6% to 55% of its total sales, and at no time do they appear to have been so insignificant that they could be said categorically not to be substantial in amount. And so far as the evidence shows the interstate work which each plaintiff performed was of the same type which they were hired to perform. It was not work which was different from that which their usual duties required and which

was performed only because of the moment's necessities."

From the two cases just referred to it appears that in determining what interstate activities of an employee should be classed as substantial in amount there should be considered whether such activities were infrequent and isolated or were frequent and recurring, whether the employee in performing such duties was performing the duties he was hired to perform as a part of his regular and usual duties. In the instant case the plaintiff's bulk station activities at the bulk plants were frequent and recurring and had the character of continuity, and such activities were engaged in by him as a part of his regular and usual duties, and the duties he performed at the bulk plants were duties he was hired to perform. In the case of Southern California Freight Lines v. McKeown, 9 Cir., 1945, 148 F.2d 890, where only 7 per cent of an employee's time was spent in interstate activities, that was held sufficient to bring him within the Act.

In the instant case there is available evidence as to the defendant's contemporary attitude and classification as to what time constituted a substantial portion of time. As heretofore noted, the defendant required the plaintiff to keep and turn in on forms supplied by it and in the manner required by it as to his activities. Such reports showed how much time was spent working at each particular bulk plant and service station. As shown by the computations made by the defendant on these reports the defendant then charged or allotted to each bulk plant or service station the time worked by the plaintiff at such plant or station. The defendant did not make such charge or allotment against such plant or station unless the time put in at such plant or station was one-half hour or more. If the time so spent was less than one-half hour it was not charged or allotted. The plaintiff made no report of time spent at such plants or stations where the particular job did not take one-half hour or more. It is obvious that the defendant if it would could have made such charges or allotments starting at 1 hour, 2 hours, or more hours, but it started its charges or allotments at one-half hour. Therefore, it is believed that the defendant itself in the instant case made its own classification as to what amount of plaintiff's time was substantial and unsubstantial so far as his activities were concerned, and that the dividing line so adopted and used was one-half hour.

It is the holding of the Court that those weeks during the period of limitation in which the plaintiff put in one-half hour or more at bulk plant work, were weeks in which a substantial part of his activities were "in commerce" under the Fair Labor Standards Act, and that as to the remaining weeks during that period he was not so engaged. However, there are only two weeks included in the recovery where the plaintiff put in one-half hour at bulk plant work. All the other weeks for which recovery is allowed the time put in was greater. It is believed that where engaging "in commerce" is a regular recurring part of an employee's work and his engaging "in commerce" has the characteristic of continuity that such an employee should be regarded as being engaged "in commerce" for all weeks except those in which he puts in no time at such work or in which the time put in is so little as to be classed as unsubstantial. The word "substantial" is not found in the Fair Labor Standards Act and is a term of judicial and administrative origin so far as that act is concerned. The ultimate question of coverage under the Fair Labor Standards Act is a judicial question committed to the courts. Walling v. La Belle S. S. Co., 6 Cir., 1945, 148 F.2d 198, 202. Therefore, the Administrator's definitions of what may or may not be "substantial" as to various exemptions under the Act, are not determinative of what is "substantial" so far as coverage of the Act is concerned. The Courts have refused to lay down any hard and fast rule or any fixed percentage in connection with the term "substantial" as used in connection with the matter of coverage of the Act.

The defendant and the plaintiff both submitted summaries showing, among other matters, the number of overtime hours worked. There is a discrepancy between the two summaries. This is occasioned by the fact that the plaintiff included in his total hours for certain weeks time taken off during working hours because of illness. The plaintiff was paid on a monthly basis and apparently no deduction was made from his monthly pay because of time taken off during his regular working hours because of illness. It is the holding of the Court that the hours taken off by the plaintiff during his regular working hours because of illness cannot be used

**140**

for the purpose of figuring overtime hours in a particular week, even though no deduction was made from his monthly salary because of such absences. This is a different situation than that in which the employer seeks to apply time off in one week against overtime of another week.

 The parties stipulated in open Court of record that the salary of the plaintiff from January 1, 1937, to January 1, 1940, was $135 per month, and that from January 1, 1940, to July 16, 1941 (the end of the period in question) it was $150 per month. In his complaint the plaintiff asked for overtime compensation in the total sum of $844.83 and for liquidated damages in the same amount and for attorney fees. At the trial the plaintiff in connection with a summary of his claim testified that he figured the amount of the overtime pay all the way through on the basis of $135 per month, and that the amount he claimed was based on that figure. It appears that the plaintiff had been uncertain as to when his salary was changed from $135 to $150 per month. The total amount of overtime compensation to which the plaintiff is entitled on the basis of a salary of $135 per month up to January 1, 1940, and $150 a month from January 1, 1940, to July 16, 1941, is the sum of $428.03. If the overtime compensation is figured on a basis of $135 a month straight through, the amount of the overtime compensation is, of course, less. There is no element of surprise so far as the defendant is concerned as to this matter. It is well settled that an employee cannot validly agree to waive his right to overtime compensation and liquidated damages. Brooklyn Savings Bank v. O'Neil, 1945, 65 S.Ct. 895. It is clear that no one but the employee himself can bring an action for such compensation and liquidated damages. Brooklyn Savings Bank v. O'Neil, supra. An employee, therefore, can in effect waive his claim to such compensation and damages by failing to bring suit within the applicable period of limitation. It seems clear that an employee who at the time of bringing suit has owing to him overtime compensation and liquidated damages for a period then passed, cannot split his claim into separate suits, for a suit and recovery for part of the amount owing at the time the suit was commenced would bar the balance. D. & L. Production Co. v. Cuniff, Tex.Civ.App.1944, 180 S.W.2d 205. If an employee does bring suit for less than the amount owing him for overtime compensation and liquidated damages, it would

seem that a court could not force a greater recovery upon him. It would also seem that if an employee did bring suit for the full amount owing him and then during the course of the proceeding amended to claim less than that amount, a court could not give him in excess of the amount claimed after the amendment. The situation would seem to be the same if an employee during the course of the trial formally of record waived, renounced and abandoned part of his claim. In the instant case the amount of the recovery awarded is less than the amount asked in the complaint. It is the holding of the Court that the plaintiff did not by his statements as a witness intend to waive or abandon any part of his claim, and that the statements in question were occasioned by uncertainty as to when the salary change took place and the fear of complications that might grow out of it. It is the view of the Court that when an employee sues for recovery of overtime compensation and liquidated damages, and in his complaint states the total amount claimed, and it develops that the employee's computations in making up that amount were computed on a mistaken and erroneous basis, and where there is no surprise so far as the defendant is concerned, that the Court may allow recovery within the amount claimed computed on the proper and correct basis.

 The applicable rules as to matters of computations are set forth in Interpretative Bulletin No. 4, heretofore referred to. The plaintiff was paid on a monthly basis. In order to determine the weekly wage the monthly salary is multiplied by twelve, and that sum is divided by fifty-two. When the weekly wage is thus determined, the hour rate is determined by dividing the weekly wage by the regular number of hours worked during the week. In the instant case the regular work week consisted of 54 hours. The hourly wage rate of the plaintiff as thus determined was 57.68 cents per hour from October 2, 1939, to December 30, 1939, when his monthly salary was $135, and 60.77 cents per hour from January 2, 1940, to July 15, 1941, when his monthly salary was $150. The monthly salary paid is deemed to have been paid at the regular hourly rate for 54 hours in each week. The hourly rate being in excess of the statutory minimum, the plaintiff has been fully paid for all hours up to 40 in each week. This monthly salary, however, only paid the regular hour rate for the hours between 40 and 54. As to the hours between 40 and 54 the plaintiff was

entitled to time and a half, but since he was only paid at the regular hourly rate for those hours, he is entitled to recover one-half of the hourly rate for such hours. During the period from October 2, 1939, to December 30, 1940, the number of hours the plaintiff worked from 40 to 54 during the weeks for which recovery is allowed, was 120 hours. Figuring one-half of the regular hourly rate or 28.84 cents for those hours gives the sum of $34.60. During the period from January 1, 1940, to July 15, 1941, the number of hours the plaintiff worked from 40 to 54 during the weeks for which recovery is allowed was 805 hours. Figuring one-half of the regular hourly rate or 30.38 cents for those hours gives the sum of $244.56. For the hours worked by the plaintiff during the weeks for which recovery is allowed above 54 hours the plaintiff is entitled to recover at the rate of 1½ times the regular hourly rate. During the period from October 2, 1940, to December 31, 1940, the plaintiff worked 33 hours which were in excess of 54 hours a week. Figuring those hours at the 1½ time rate or 86.52 cents per hour gives the sum of $28.55. During the period from January 1, 1940, to July 15, 1941 the plaintiff worked 132 hours in excess of 54 hours a week. Figuring those hours at the 1½ time rate or 91.15 cents per hour gives the sum of $120.32. The total overtime compensation to which plaintiff is entitled is the sum of $428.03. The awarding of liquidated damages is mandatory. Seneca Coal & Coke Co. v. Lofton, 10 Cir., 1943, 136 F.2d 359. Therefore the plaintiff is allowed the additional sum of $428.03 as liquidated damages. Under 29 U.S.C.A. § 216(b), it is provided that where overtime compensation and liquidated damages is awarded, the Court may in addition allow a reasonable attorney's fee to the plaintiff to be paid by the defendant. Such an award of attorney's fee is not awarded as a separate fee due the attorney, but is merely a part of the judgment. In re L. E. Elliott Brokerage Co., D.C.Kan.1942, 48 F.Supp. 144. The amount to be awarded as attorney's fee appears to be to a large extent in the discretion of the Court. In some cases the award of attorney's fee has been in excess of the amount of overtime compensation and liquidated damages recovered. Mid-Continent Pipe Line Co. v. Hargrave, 10 Cir., 1942, 129 F.2d 655. In that case it was held that if it was fairly apparent to the trial Court that the case would be appealed, that it was proper to consider that matter. In the instant case it is not fairly apparent whether the case will or will not be appealed by either party. It is believed that in the absence of unusual or aggravating circumstances that the amount as attorney's fee in a Fair Labor Standards Act case should have a reasonable relation to the amount of the overtime compensation and liquidated damages recovered. It is believed that in the instant case an attorney's fee of $400 would be a reasonable one under the circumstances.

It was held in the case of Brooklyn Savings Bank v. O'Neil, supra, that interest is not recoverable on sums awarded as overtime compensation and liquidated damages under the Fair Labor Standards Act. Accord: J. F. Fitzgerald Const. Co. v. Pedersen, supra; Colquette v. Crossett Lumber Co., 8 Cir., 1945, 149 F.2d 116. The defendant in this case on July 16, 1941, was indebted to the plaintiff in the sum of $856.06. If the rule were otherwise than as just above stated, the plaintiff would have been entitled to interest at the legal rate on the sum of $856.06 from July 15, 1941. However, even though the plaintiff is not entitled to such interest there is the question of interest on the judgment herein after the date of its rendition until paid. It is believed that there is a distinction between interest on a claim before it is reduced to judgment and interest on a judgment as a judgment. In the case of Brooklyn Savings Bank v. O'Neil, supra, the Court on page 906 of 65 S.Ct. states: "Interest is not recoverable on judgments obtained under Section 16(b)." However, in that case the Court was dealing with the question of the allowance of interest on overtime compensation and liquidated damages, and not with the question of interest on a judgment as a judgment. In 28 U.S.C.A. § 811, it is provided in part: "Interest shall be allowed on all judgments in civil causes, recovered in a district court, * * * and it shall be calculated from the date of the judgment, at such rate as is allowed by law on judgments recovered in the courts of such State." Under Section 9405 of the 1939 Code of Iowa, the rate allowed by law on judgments is five per cent. It is the holding of the Court that the plaintiff cannot recover interest on his claim up to the date of judgment, yet the judgment itself shall bear interest at the rate of five per cent from the date thereof until paid.

On Motion for New Trial.

The opinion in this case, following a trial on the merits, was filed on September 28,

1945. Immediately thereafter the defendant filed a motion for a new trial, raising again the question of the statute of limitations and other questions, which motion was argued and taken under advisement. Since the motion for new trial was taken under advisement, the Circuit Court of Appeals on October 29, 1945, filed its opinion in the case of Republic Pictures Corporation v. Francis Kappler, 8 Cir., 151 F.2d 543 affirming D.C., 59 F.Supp. 112, holding that Chapter 267 of the Acts of the 50th G. A. of Iowa was unconstitutional. Therefore, it is held, as in the original opinion, that the applicable statute of limitations in the instant case is the Iowa five year statute of limitation relating to actions on unwritten contracts. There is an extensive note on the statute of limitations in Wage and Hour cases in 157 A.L.R. 545.

There were some errors in the computations in the amount due the plaintiff in the original opinion and decision. In this case the plaintiff was employed at a regular monthly salary of $135 per month for awhile, and then at the rate of $150 per month. The plaintiff as a rule worked fifty-four hours a week, but during many weeks worked in excess of fifty-four hours. In the original opinion it was assumed by the court that the monthly salary did not compensate the plaintiff at the regular rate for the hours worked each week, in excess of fifty-four hours. A re-examination of the evidence in the case shows that such an assumption was erroneous, and that the true situation was that the regular monthly salary compensated at the regular rate for all the hours worked by the plaintiff during all the weeks in question. Such being the case, the plaintiff's over-time compensation is to be computed according to the rules applicable to a fluctuating or variable work week. Overnight Motor Transp. Co. v. Missell, 1942, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Walling v. Youngerman-Reynolds Hardwood Company, 325 U.S. 419, 65 S.Ct. 1242. Under those rules the monthly salary is to be multiplied by twelve and then divided by fifty-two, which gives the weekly rate of pay, then the weekly rate is divided by the number of hours worked each week, which gives the regular hourly rate for that week. If that regular hourly rate gives a rate in excess of the minimums fixed by the Act, then the employee has been paid the regular rate in full for that week.

In the instant case the regular rate, as thus computed, was in excess of the statutory minimums. The employee is entitled to overtime compensation for all hours worked in excess of the maximums prescribed by the Act at one-half of the regular rate. In the case of a variable or fluctuating work week, the regular rate, and hence the overtime work, varies from week to week, and the amount of overtime compensation due the plaintiff has been re-computed accordingly. In the original opinion it was overlooked that during the period from October 24, 1938, to October 24, 1939, the Act did not require overtime compensation to be paid until after forty-four hours and that during the period from October 24, 1939, to October 24, 1940, the Act did not require overtime compensation be paid until after forty-two hours instead of forty hours. Re-computing the amount due the plaintiff upon the basis of a fluctuating and variable work week, and upon the basis of the higher maximum hours permitted during the first two years of the Act, the amount of the overtime compensation due the plaintiff is the sum of 323.39, and the amount of liquidated damages due the plaintiff is $323.39. The original allowance for attorney fee in the sum of $400 will remain unchanged.

There is one other matter that requires attention. On June 11, 1945, I. T. #3742 was issued which is as follows:

"Internal Revenue Code.

" 'Retroactive wages and overtime compensation paid by an employer to his employees pursuant to Section 16(b) of the Fair Labor Standards Act of 1938 (52 Stat. 1060 [29 U.S.C.A. § 216(b)]) constitute wages under Section 1621(2) of the Internal Revenue Code [26 U.S.C.A. Int. Rev.Code § 1621(a) (2)] and are subject to withholding of income tax at the source, irrespective of whether such amounts are paid as the result of a judgment of a court or in accordance with a stipulation or settlement reached by the parties involved. Payments representing liquidated damages made by an employer to his employees pursuant to section 16(b) supra, do not constitute wages and are not subject to withholding of income tax at the source.'

"Advice is requested whether retroactive wages, overtime compensation or payments representing liquidated damages paid by an employer to his employees pursuant to section 16(b) of the Fair Labor Standards

Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 216(b), constitute wages under section 1621 (a) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1621(a), and are subject to withholding of income tax at the source.

"As a result of an order issued by the United States Department of Labor, the employer has determined that he owes 'back wages' to a number of his present and former employees for the period July, 1942, through November, 1943. It is assumed that the amounts determined to be owing to such employees were paid on or after January 1, 1945. Section 16(b) of the Fair Labor Standards Act of 1938 provides as follows:

" 'Any employer who violates the provisions of section 6 (section 6 relates to minimum wages) or section 7 (section 7 relates to maximum hours) of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and, in any additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.'

"Section 405.1 of Regulations 116 provides in part as follows:

' * * * These regulations apply to all wages (as defined in section 1621) paid on or after January 1, 1945, regardless of when such wages were earned. * * *'

" [49] The term 'wages,' as defined in section 1621(a) of the Code, means all remuneration for services performed by an employee for his employer, with certain exceptions not here material. Remuneration for services, unless such remuneration is specifically excepted by the statute, constitutes wages even though at the time paid, the relationship of employer and employee no longer exists between the person in whose employ the services were performed and the individual who performed them. Section 405.101 of Regulations 116.

"[50, 51] It is held that payments of retroactive wages and overtime compensation paid by an employer to his employees pursuant to section 16(b) of the Fair Labor Standards Act of 1938, supra, constitute wages under Section 1621(a) of the Code and are subject to withholding of income tax at the source, irrespective of whether such amounts are paid as the result of a judgment of a court or in accordance with a stipulation or settlement reached by the parties involved. It is further held that payments representing liquidated damages made by an employer to his employees pursuant to section 16(b) of the Fair Labor Standards Act of 1938, supra, do not constitute wages and are not subject to withholding of income tax at the source."

It is therefore necessary that provision be made in regard to the matter of the withholding taxes as to the overtime compensation. Therefore, the judgment in the instant case will be modified to provide that upon the defendant's filing an affidavit showing the amount of taxes withheld and remitted by it, that the judgment as to overtime compensation will be reduced by the amount so withheld and remitted. The findings of fact, conclusion of law, and judgment will be modified in accordance with this opinion, and the defendant's motion for a new trial is denied.